58 N.J. Super. 560 (1959)
157 A.2d 21
THE STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
THOMAS CACCAVALE, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued November 23, 1959.
Decided December 23, 1959.
*563 Before Judges GOLDMANN, CONFORD and FREUND.
Mr. Frank J. Valgenti, Jr., argued the cause for appellant (Mr. Charles M. Judge, on the brief).
Mr. Bertram Polow, First Assistant Prosecutor, argued the cause for respondent (Mr. Frank C. Scerbo, Morris County Prosecutor, attorney).
The opinion of the court was delivered by GOLDMANN, S.J.A.D.
The Morris County grand jury returned an indictment charging defendant, in two counts, with bookmaking in violation of N.J.S. 2A:112-3. The jury found him guilty as charged and he was sentenced to a State Prison term of 1 to 1 1/2 years on each count, to run concurrently. Defendant made no motion for a new trial but did move for resentencing. Following the denial of this motion he appealed and was admitted to bail pending determination of the appeal.
The room where the alleged bookmaking took place is located toward the rear of a building on Waverly Place, Madison, N.J., owned by defendant's father, Joseph. The ground floor front is occupied by Wayne Cleaners, whose proprietor has the use of the rear room for storing supplies. Besides cleaning supplies and boxes, there were paint ladders and paint cans in the room, as well as a table, chair and telephone. According to Joseph Caccavale, he had rented the rear room to one J. Beroni, a painter, in March 1957. He further testified that Beroni had at various times fallen in arrears in rent payments; that he had sent defendant to see Beroni in order to collect back rent, and for that reason had given his son a key to the room.
*564 The police had the rear room under surveillance on January 23 and 24, 1958. Defendant was observed on both days entering the hallway which led from a side entrance to the room. (His explanation was that he had gone there to see Beroni about the rent.) Early in the afternoon of January 24, Captain of Detectives Burke, who was associated with the prosecutor's office, and a group of local police officers conducted a raid. We deem it unnecessary to detail all that took place at the time. Suffice to say, defendant was apprehended after he had left the rear room by a second door leading directly to the outside of the building. He had closed and barred the hallway door when he saw officers in the corridor, and during the eight or ten minutes he was in the room the officers smelled something burning and heard liquid drawn off. After apprehending defendant the police found smoke in the room, a bucket containing charred paper, and the floor partially covered with burned paper. On the table they found a racing publication dated January 24; underneath were pads of paper, identified by Burke as rundown sheets, and in the drawer two bills of recent date, made out to defendant. Although defendant denied he had a key to the room, the officers found such a key in his possession.
Defendant's first ground of appeal is that the conduct of the prosecutor, in eliciting from Captain Burke remarks allegedly highly prejudicial to defendant, amounted to substantial error and therefore the denial of a fair trial. Burke was the first witness called by the State. On direct examination he testified to the surveillance made at his direction of the room where the alleged bookmaking took place, the surveillance of defendant on the two days in question, the raid, and the apprehension of defendant. Part of the cross-examination of Burke was devoted to the investigation he had made with regard to the installation of the telephone in the rear room. It developed that one Arthur Badash had told him how the phone was installed. Badash had been a partner of David Arrow in the Wayne Cleaners enterprise, but was no longer associated with him at the time of defendant's *565 arrest. Immediately after the raid Badash had told Burke he could not recall who had given him the key to the room. When Burke phoned him a week before the trial Badash said that Joseph Caccavale had given him the key, but when the captain called on Badash personally, he told him he had in the meantime talked to Arrow and now remembered that it was not Joseph Caccavale who gave him the key, but a person dressed as a painter. It is to be noted that all this was manifest hearsay. Further, no part of the direct examination dealt with conversations between Burke and Badash; indeed, in no respect did it deal with Badash or his former partner Arrow.
On redirect examination the prosecutor further pursued this line of inquiry. After establishing that Badash was no longer a partner at the time of the raid the prosecutor inquired:
"Q. You say, in response to Mr. Valgenti's question, he asked whether you investigated to ascertain who gave the key to the telephone man and you say that the man who was still there with the Wayne Cleaners told you what? You tell us that.
A. No, I did not. As I can best recall it, Dave Arrow, the man that has the business now, also said, at the time, that he was interviewed here in the Prosecutor's office, that it was one of his workers, or either that or the key was hanging up some place when Mr. Tracey, the installer, came into the cleaning establishment.
Q. All right. Do you know which one of these two men, if any, if either, actually gave the installer the key?
A. I do not. The only thing I can say was that Art Badash told me, on the telephone, that he was the one that gave the key to Mr. Tracey, the installer.
Q. All right. Now just one other question. Did either of them, at any time, indicate any reluctance to answer the question?
A. They both were reluctant to answer the question.
Q. Did they tell you why?
A. Yes, they said they were scared. Mr. Badash told me on the telephone, he said, `What do you want me to get, a bullet in my back,' or words to that effect.
Mr. Polow: I have no further questions.
The Court: You may be excused."
There was no objection to this line of inquiry, nor did defense counsel make any request that the jury be instructed *566 to disregard Burke's final answer, which he now considers as prejudicial. Nonetheless, defendant insists that no instruction to the jury could possibly, in the circumstances, have erased the effect of Burke's remarks on the minds of the jury. The contention is that the prejudice created was so great as to constitute substantial error, requiring reversal under the plain error rule, R.R. 1:5-1(a), citing among other cases, State v. Landeros, 20 N.J. 69, 74-75 (1955); State v. D'Ippolito, 19 N.J. 540, 548 (1955). The argument made is that there was nothing to excuse the direct inference conveyed to the members of the jury by Burke's last answer that they were dealing with a defendant so utterly vicious that he would put a bullet in the back of one who informed against him. It is also claimed that the timing of the questions and the manner in which they were phrased on redirect suggests that the prosecuting attorney knew what the answers would be.
Ordinarily, where defense counsel elicits part of a conversation between a witness and another person, the State may introduce the remaining portions of such conversation relevant to the part offered. 7 Wigmore, Evidence (3d ed. 1940), § 2113, p. 523; State v. Doro, 103 N.J.L. 88, 93 (E. & A. 1926); and cf. State v. Engsberg, 94 N.J.L. 464, 466 (E. & A. 1920).
The prosecution probably knew that Badash had told Burke of his fear of getting a "bullet in my back," for Burke was associated with the prosecutor's office and had been in charge of the investigation. However, it had not attempted to elicit this information on direct examination. It was only when Burke's cross-examination showed that Badash had given three versions of how he got the key to give to Tracey, who installed the telephone  the latest version being the one about the painter in overalls, and the most favorable to the defense  and the subject had been dropped without exploring the reason or motive behind the inconsistencies, that the State asked the questions it did.
*567 We cannot say that Burke's last answer, standing by itself and considered in the setting of the testimony adduced up to that point, exhibits the prejudicial character of what was criticized in Landeros and D'Ippolito, or in cases like State v. Siciliano, 21 N.J. 249, 262 (1956); State v. Orecchio, 16 N.J. 125, 140 (1954); State v. Bogen, 13 N.J. 137 (1953); and State v. Ferrell, 29 N.J. Super. 183 (App. Div. 1954). As we have already observed, the final answer on redirect went unchallenged. Moreover, defense counsel himself referred to the testimony in his summation, and thereby gave it extra importance, when he said:
"It was said a couple of times in the case that witnesses were put in fear. One fellow was going to get shot in the back, and, I don't know, some other fellow was also going to get shot. There is not too much that I can say about a remark like that, Ladies and Gentlemen. I am sure that you will regard it in its proper light and you've got to regard it after having watched the witnesses for the defense. The defendant himself, and he had only one witness, his father. The impression, that I suppose the State is trying to leave in your mind here is that you are dealing with some racketeers and if a witness opens his mouth, next time he will find himself in a lead coffin or a concrete coffin, at the bottom of the river. That is completely unfair, Ladies and Gentlemen. Here is a boy that is on the witness stand, the defendant, never been convicted of any crime, being frisked for a gun and supposedly made to appear that he was carrying guns. He says he never owned one. His father gets on the stand, a business man with investments. Certainly he doesn't need any bookmaking activity to keep himself nor his children. And the impression is being made here with these remarks that these are notorious people whom no on would dare testify against, that if you do, why you're apt to find yourself in a bad spot. A bit unfair, Ladies and Gentlemen, after you found some evidence, watched the defendant and his witness; anything in the testimony, you should disregard that from your mind and is prejudicial and not worth any kind of value in the case in your deliberation toward a judgment."
The defense, as noted, did not ask the court to instruct the jury to disregard Burke's concluding testimony. The attack upon this testimony comes late in the day.
There is more merit in defendant's second point, which is that the neutralization of the testimony of prosecution witness *568 Capozza was highly prejudicial. The State had earlier called Thomas Rego, who testified that he became involved in gambling activities in October or November 1957. A friend had given him a phone number to call so that he might place bets. The number was identified by the telephone company as the telephone in the rear room that was raided. Rego said he regularly called this number and spoke with a person he knew as "John," and received calls from "John." There were bookmaking calls between Rego and "John" daily at about 1 P.M., except Sunday. Rego would square accounts with "John" every Saturday by paying money to or receiving money from Capozza in Morristown. He testified that when he placed a new bet on Monday, "John" never complained of not receiving the money paid over on the previous Saturday night. The witness testified that he had gotten to know "John's" voice very well. After Rego was arrested the police arranged a telephone call and had him talk to defendant on the other end. He identified the voice as that of "John."
Capozza was called by the State, ostensibly to connect defendant with the Rego-Capozza Saturday pay-offs, thereby establishing that defendant was "John" and the recipient of bookmaking proceeds. At the very start of the direct examination Capozza denied he had received money on Saturdays from Rego in connection with bookmaking activities. The prosecution told the court that the witness was testifying "differently from what the State had expected, or had any reason to expect," and pleaded surprise. However, it announced that it would pursue the questioning a bit further to see what developed. In answer to a question whether he had received money from Rego every Saturday prior to January 24, 1958 for a period of months, Capozza answered that he had. He explained that the money represented settlements of bets he had made directly with Rego by phone. The witness acknowledged he had appeared at the prosecutor's office on January 24, in the presence of certain named police officers and Rego. The prosecution then inquired, *569 "Were you asked, at that time, whether or not you had taken money from Rego every Saturday in connection with a bookmaking practice?" There was an immediate objection on the ground that defendant was not present and the prosecuting attorney was attempting to impeach his own witness. The prosecution then requested an opportunity to argue the point in the absence of the jury, and the court declared a recess.
While the jury was out of the room the prosecuting attorney told the trial judge he intended to show that on January 24 Capozza, in the presence of police officers and Rego, had admitted he took money from Rego every Saturday and turned it over to defendant. He represented to the court that Capozza had never denied he took the money in connection with bookmaking activities; in fact, Capozza had subsequently come to the prosecutor's office, preparatory to appearing before the grand jury, and when questioned had again admitted that the money he had gotten from Rego every week was in connection with bookmaking. The prosecuting attorney then said:
"Now, if your Honor please, I had no knowledge, before today, that he would deny that he took money from Thomas Rego every week and that he was the one who took the proceeds of the bookmaking activities from Rego. I am surprised and, I say to your Honor, that there is adequate law that where a party presents a witness who gives testimony contrary to what the party is entitled to expect, we are entitled to neutralize his testimony, not to impeach the witness, but to neutralize his testimony, and that is all I am trying to do. And, where a witness is hostile, unfriendly or gives contrary testimony to what he has said previously, I am entitled to cross-examine him and I am entitled, for the purpose of neutralizing him, to disprove his present testimony."
Defense counsel still objected, claiming that anything Capozza may have said was not in the presence of defendant, and he called the prosecuting attorney's attention to the fact that if Capozza had told the authorities that defendant was connected with the bookmaking activity, it was strange that he had not been called before the grand jury. A long *570 discussion between counsel and the trial judge ensued, in the course of which the prosecuting attorney pointed out the purpose of his being permitted to cross-examine Capozza and the authorities supporting his position. He said that if Capozza denied making the statements he did to the police officers, he would put them on the stand to neutralize his testimony. The end result was that the trial judge said he would allow a limited examination to neutralize Capozza's testimony, but would not permit the State to call additional witnesses for that purpose. He announced that after the examination of Capozza was concluded he would briefly advise the jury as to the effect of neutralization, and would also elaborate on the point in his charge.
The jury was recalled and the prosecution then continued with its examination of Capozza:
"Q. Now, Mr. Capozza, you do recall the time on January 24, 1958, in the prosecutor's office, when you were questioned in the presence of Lieutenant Gervasio, Detective Steele, Captain Burke and Thomas Rego?
A. That I do.
Q. And do you recall that they asked you about your relationship with Thomas Rego?
A. My relationship with him?
Q. Yes.
A. No, I don't.
Q. Oh, you don't recall any questions about Rego at all?
A. Not that particular question.
Q. Do you recall that you told them that you were the one who put Rego in business?
A. I never said such a thing.
Q. Do you recall that you were formerly a runner for Luke Maione?
A. I was never a runner for Luke Maione.
Q. And that you said that when Luke Maione passed away, Thomas Caccavale took over the operations?
A. I never said such a thing.
Q. And do you recall that every week you said that every week Thomas Rego would deliver the money to you for delivery to Thomas Caccavale?
A. I never said such a statement.
Q. Never said it?
A. No, sir.
*571 Q. Do you recall, sometime later, a few weeks later, you were in my office, talking to me in the presence of Captain Burke and others about the same thing?
A. In your presence?
Q. Yes, sir. And I questioned you myself.
A. I don't recall.
Q. You don't recall? Do you recall that was the day when you were to appear before the Grand Jury and you talked to me first?
A. Was that the day?
Q. Do you recall that day?
A. Yes, sir.
Q. You recall that question, don't you?
A. Yes, sir.
Q. Do you recall that you told me then that you would refuse to identify Caccavale?
A. Never said such a thing.
Q. You never said that?
A. No.
Q. Do you recall me asking you why you would refuse, do you recall that?
A. No, I don't.
Q. You don't remember that conversation? Do you remember you said you'd rather go to jail than have anything happen to your wife and children?
A. I never said such a thing.
Q. You never said such a thing?
A. No.
Q. Do you recall the Prosecutor of Morris County was in the same office at the same time?
A. Yes, I remember.
Q. But you don't remember saying any such thing?
A. I never said such a thing." (Italics ours)
The doctrine of neutralization authorizes the cancellation or, as it has sometimes been described, the "erasure" from the case of unexpectedly adverse testimony given by a party's own witness, when necessary to prevent a miscarriage of justice. Neutralization is available to accused and prosecution alike, although more often resorted to by the latter when a state witness surprises by supplying unexpectedly adverse testimony, damaging to the State's case. In such a circumstance, the witness' prior written or oral statements may be admitted by the trial court, in the sound exercise of its legal discretion, for the purpose of wiping the slate clean of his specific evidence upon the point or *572 points concerned. O'Regan and Schlosser, N.J. Criminal Practice (rev. ed. 1950), § 361, p. 684, and annotation. This neutralizing evidence is often hearsay, and as such has no probative force. The sole effect of neutralization is to restore the status prevailing before the witness testified upon the particular point or points under neutralization, to the same extent as though he had never been called. His testimony, so neutralized, is out of the case completely, as a matter of law.
The so-called neutralization admitted in this case was obviously improper and prejudicial. The authorities are clearly to the effect that for neutralization to be warranted there must be actual surprise  unexpectedly adverse testimony. See, for example, State v. D'Adame, 84 N.J.L. 386, 395 (E. & A. 1913) and State v. Kysilka, 85 N.J.L. 712, 714 (E. & A. 1914), establishing a long line of authority; O'Regan and Schlosser, op. cit.; 58 Am. Jur., Witnesses, § 799, p. 445 (1948).
The very questions put by the prosecution, italicized by us in the quoted material, reveal that it could not have been surprised by the position Capozza would take if called to the stand. He had talked to the prosecuting attorney on the day he was to appear before the grand jury, and had told him he would refuse to identify Caccavale. The prosecution was on definite notice that it had an unwilling witness on its hands; in fact, it was undoubtedly for this reason that it did not produce Capozza before the grand jury. It is to be noted that the prosecution had persuaded the court to allow neutralization by the representations it made in the course of the colloquy during the recess.
At oral argument plaintiff sought to justify the neutralization on two grounds. Its first claim was that it was completely surprised when Capozza denied receiving money from Rego in connection with bookmaking activities. Bookmaking, in the circumstances here present, certainly implied the participation of a third person, the man who made book  in short, *573 the defendant. Since the prosecution was interested in establishing bookmaking, with defendant as the principal participant, it surely did not intend to stop with questioning Capozza about his relations with Rego; clearly, it meant to follow up its initial inquiry with further questions that would establish that Capozza was involved with defendant. And, as we have observed, the prosecution knew, by reason of its questioning of Capozza soon after the raid, that he would not testify to bookmaking but only to private bets placed with Rego.
The second ground of justification offered by plaintiff is that since Capozza had previously told the prosecutor the whole story, including his involvement with defendant, the State was entitled to assume that once he took the stand and was under oath, he would tell the truth. This is completely unrealistic, because Capozza had told the prosecutor in most positive terms that he would not implicate defendant for fear of what would happen to his wife and children.
To allow the neutralizing testimony to stand would completely demolish the principle that a defendant cannot be condemned on hearsay testimony. Neutralization may never be used as a means of conveying inadmissible matter to the jury by the device of offering a witness whose testimony is known to be adverse and then, under the guise of impeachment, putting to him questions which will place before the jury ex parte statements he has made and whose only effect can be to damage, if not destroy, defendant's case.
By means of questions beginning with "Do you recall" the prosecution was able to use the supposed neutralization to get to the jury that Capozza had set Rego up in business; he had been a runner for Luke Maione; when Maione died, defendant took over his gambling operations; Rego would each week give Capozza bookmaking money for delivery to defendant; and that Capozza would refuse to testify against defendant because he would rather go to jail than have anything happen to his wife and children.
*574 Not only was neutralization unwarranted in light of the prosecution's foreknowledge that Capozza would refuse to implicate defendant, but it was highly prejudicial. The questions put to defendant were actually assertions of statements he was alleged to have made, revealing personal knowledge of the illegal enterprise. The effect of the neutralization was crushing to defendant's cause. There is no need to recite the many occasions when our courts have criticized over-zealous conduct by the prosecution. The cases already cited will serve as a sample.
One of the by-products of the neutralization was the effect of the question as to why Capozza had allegedly said he would refuse to identify Caccavale: "Do you remember you said you'd rather go to jail than have anything happen to your wife and children?" When we consider this question together with the "bullet in the back" testimony of Captain Burke, we can well understand defendant's claim that there was raised in the minds of the jury the image of a man who would stop at nothing if anyone testified against him.
True, the trial judge, immediately after Capozza had left the stand, instructed the jury that the effect of the neutralization was to cancel out his testimony and they were to disregard that testimony completely; and a similar instruction was given in the course of the charge. But such instruction did not cure the prejudice which may have been created. The impact was too great, the imprint too deep, the influence too persuasive, to be erased by the court's directive, no matter how explicitly given.
The conviction is reversed and a new trial directed.