865 A.2d 693

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT, v.
CURTIS BENTHALL, DEFENDANT–APPELLANT.

Argued September 27, 2004—Decided February 1, 2005.

374

*Alan I. Smith,* Designated Counsel, argued the cause for appellant (*Yvonne Smith Segars,* Public Defender, attorney).

*Elizabeth M. Devine,* Deputy Attorney General, argued the cause for respondent (*Peter C. Harvey,* Attorney General of New Jersey, attorney).

Justice LaVECCHIA delivered the opinion of the Court.

This criminal appeal involves application of New Jersey Evidence Rule 607, wherein the circumstances under which a party may neutralize surprising testimony from a witness are set forth. Because we conclude that the State was not surprised by the testimony of an uncooperative witness in this matter, the State should not have been permitted to neutralize that witness's testimony or to use the neutralized testimony for substantive purposes in securing defendant's conviction. We therefore reverse.

## I.

A jury convicted defendant, Curtis Benthall, as an accomplice to first-degree robbery, contrary to *N.J.S.A.* 2C:15–1, and for second-degree possession of a weapon for an unlawful purpose, contrary to *N.J.S.A.* 2C:39–5a. He received a fifty-year extended term sentence with a seventeen-year parole disqualifier on the robbery conviction, and a concurrent eight-year prison sentence with a four-year parole disqualifier on the possession offense.[1]

---

[1] Defendant received a fifty-year extended term sentence for the robbery conviction as a second-time offender under the *Graves* Act, *N.J.S.A.* 2C:43–6c, with a seventeen-year parole disqualifier imposed pursuant to the No Early Release Act, *N.J.S.A.* 2C:43–7.2.

The State alleged that defendant's role in the robbery was that of driver of the getaway car. The facts presented at trial are these. At approximately eight o'clock p.m., or near closing time at the barbershop, Clyde Anthony Ingram and another barber, known only as Jay, were working when a light-skinned black male entered with a handgun. His face was covered by a mask and a bandana printed in a pattern representative of dollar bills or dollar bill signs. The perpetrator robbed the barbers of cash in their possession and snatched gold chains from their necks. Nothing was taken from the customers present or from the shop.

Ingram was working closest to the entrance of the shop. As the perpetrator's attention focused on Jay, Ingram was able to flee. While outside, Ingram saw the perpetrator run from the barbershop with Jay in pursuit. Ingram joined in the chase, but before the two barbers could catch the gunman, he jumped into a vehicle (allegedly defendant's vehicle) that drove away.

Back at the barbershop where the police had arrived,[2] Jay refused to speak with the officers and refused to identify himself other than by his first name. The State never called him as a witness. Ingram also resisted speaking with the officers at first, but agreed to go to the police station if accompanied by the barbershop manager.

Meanwhile, shortly after the robbery occurred, a patrol officer noticed a vehicle driving the wrong way down a one-way street and attempted to pull the vehicle over. The vehicle did not stop. It proceeded toward some nearby housing projects where it slowed down. The officer observed a passenger jump from the vehicle and run into a building. That person was never apprehended. Subsequently, defendant, who was the driver of that car, heeded the police and pulled over. The vehicle was brought to the police station where, according to the police report and officer testimony, Ingram identified it as the getaway car. Ingram's

---

[2] The barbershop manager, who had been in the back storeroom while the robbery was in progress, had left the premises and called the police.

statement was not taken under oath. An inventory of the car's contents yielded a bandana, a metal clasp (also identified by Ingram), a jacket, and approximately $1,300 in cash. Defendant was arrested and indicted.

The State's case against defendant was largely circumstantial and heavily dependent on Ingram's identification of the vehicle and the other recovered articles. Ingram testified before the grand jury but was a reluctant witness whose memory failed him on several points. When called as a witness at trial, Ingram failed to appear and a material witness warrant was issued. On finally taking the stand, Ingram testified that the vehicle he was shown at the police station was not the vehicle involved in the robbery and that he could not identify the jacket recovered from defendant's vehicle.

The prosecutor moved for permission to neutralize Ingram's testimony through use of the police report, and to treat Ingram as a hostile witness. Defense counsel argued that Ingram's testimony could not constitute surprise to the prosecution in light of Ingram's grand jury testimony. The trial judge, however, found that the prosecutor was surprised by Ingram's testimony and granted the motion. Although the trial court ruled that the police report could not be used as substantive evidence pursuant to *N.J.R.E.* 803(a)(1), a contemporaneous jury charge was not given.

On defendant's appeal, the Appellate Division in an unpublished opinion remanded for merger of defendant's convictions of possession of a weapon for an unlawful purpose and robbery. All other arguments challenging the conviction were rejected, including the argument that neutralization was permitted improperly and that the neutralizing evidence was used impermissibly for substantive purposes. We granted defendant's petition for certification. 179 *N.J.* 369, 845 *A.*2d 1252 (2004).

## II.

■ Neutralization is the process by which a party, surprised by the prejudicial testimony of its own witness, utilizes the wit-

ness's previous contradictory statement to "eras[e] or cancel[ ] ...
unexpected harmful testimony by a showing—either by cross-
examination or by other witnesses—that the witness has made a
statement in conflict with his present testimony." *State v. Gallic-
chio,* 44 *N.J.* 540, 545, 210 *A.*2d 409 (1965) (citing *State v. Cooper,*
10 *N.J.* 532, 92 *A.*2d 786 (1952); *State v. Caccavale,* 58 *N.J.Super.*
560, 157 *A.*2d 21 (App.Div.1959); *State v. Baechlor,* 52 *N.J.Super.*
378, 145 *A.*2d 631 (App.Div.1958)). Evidence Rule 607 governs the
circumstances in which neutralization is permitted and provides in
pertinent part that

> the party calling a witness may not neutralize the witness' testimony by a prior
> contradictory statement unless the statement is in a form admissible under Rule
> 803(a)(1) or the judge finds that the party calling the witness was surprised.
> [*N.J.R.E.* 607.]

 Thus, when a prior inconsistent statement of a witness
does not satisfy the reliability requirements for admission under
*N.J.R.E.* 803(a)(1), the earlier out-of-court statement may be used
nonetheless by the proponent of the witness to eradicate the
witness's trial testimony if the trial court finds that the proponent
was surprised. *See* Biunno, *Current N.J. Rules of Evidence,*
comment 3 on *N.J.R.E.* 607 (Gann 2002). The trial court must
make several initial findings under *N.J.R.E.* 607 before a party
may introduce evidence of a prior contradictory statement that
otherwise qualifies as hearsay and is not admissible pursuant to
*Rule* 803(a)(1). Specifically, the court must find that: 1) a wit-
ness's testimony contradicts a prior statement made by the wit-
ness; 2) the party seeking to neutralize had no prior knowledge
that the witness would testify contrary to the prior statement;
and 3) the testimony was detrimental or prejudicial to the party
calling the witness. *Gallicchio, supra,* 44 *N.J.* at 547–48, 210 *A.*2d
409. Only then may the prior contradictory statement be used by
a proponent to neutralize a witness's testimony, subject to the jury
receiving a limiting instruction. *Id.* at 548, 210 *A.*2d 409. The
limiting instruction must "strongly emphasize that in no event is
the jury to use the prior statement as proving the truth of the
matter therein allegedly stated." *Ibid.* The jury also should be

reminded of the limited use of the neutralization evidence at the close of the trial. *Ibid.*

 In sum, there are two means for seeking to introduce neutralization evidence whose sole purpose is to restore the status of the trial evidence that prevailed before the witness's testimony. One is to challenge the testimony through introduction of *N.J.R.E.* 803(a)(1) evidence—that is, an earlier inconsistent statement that meets reliability requirements. The other route is through an assertion of surprise. The element of surprise requires that the "proponent has no indication that a witness will repudiate his prior statement and is truly surprised by the contradictory testimony given." *State v. Caraballo,* 330 *N.J.Super.* 545, 559, 750 *A.*2d 177 (App.Div.2000). We impose strictly the requirement of surprise because, in this context, "the prior statement was not written, recorded or given under oath." *State v. Johnson,* 216 *N.J.Super.* 588, 608, 524 *A.*2d 826 (App.Div.1987). If neutralization is administered loosely, then under the banner of impeachment prior contradictory evidence that is otherwise inadmissible under *N.J.R.E.* 803(c)(1) is placed before the jury by a witness's own proponent.[3]

### III.

 In the present matter, Ingram's prior contradictory unwritten and unsworn statement was contained in the police report that the State sought to introduce and his trial testimony was clearly detrimental to the prosecution. Those two required elements for neutralization are not our focus. It is the element of surprise that defendant placed in issue. The State, as the party attempting to neutralize Ingram's testimony, was required to prove surprise. *See Gallicchio, supra,* 44 *N.J.* at 547–48, 210 *A.*2d 409.

---

[3] *See generally, Caccavale, supra,* 58 *N.J.Super.* at 573, 157 *A.*2d 21, and *see also N.J.R.E.* 803(a)(1) (adopted after *Caccavale* ). The Rule expanded the means for witness impeachment to include use of a prior sworn statement, or those that are sound recorded or written and signed by the witness under circumstances supporting the statement's reliability.

The record fairly discloses, however, that Ingram was an unwilling witness from the start, a fact noted in the police report on the date in question. Although in that report he allegedly positively identified defendant's vehicle as the getaway car, the bandana as that worn by the gunman, and the metal clasp recovered from the vehicle, he refused to make a formal statement and walked out of the police station stating, "I don't want to get involved."

When next he appeared before the grand jury, Ingram's testimony was confusing, often contradictory, and given grudgingly. In respect of the bandana, the police report states that Ingram made a positive identification. Before the grand jury, he testified equivocally:

A: I think it was with dollar—it had dollar signs inscripted [sic] on it.

* * *

A: And I think they had a piece of the bandanna that he had wrapped around his face.

Q: Same kind of bandanna.

A: I think—it was dark because the bandanna he showed us had dollar signs on it, but the bandanna that the guy had wrapped around his face was similar in color, because if I—he had a bandanna with dollar signs, I definitely would have remembered it, but I think he had the bandanna wrapped around not only his face, but his neck.

Q: I think you just confused me and everybody else.

A: When the guy came inside, he had a grey bandanna wrapped on him, but the bandanna that they found was dollar signs which was grey and green in color.

* * *

Q: But when I asked you before, you said he had—

A: A bandanna wrapped around his face which was the same color as the dollar signs that he had. All I can remember was the color.

Q: The color of it.

A: Which was grey and green.

Q: Okay.

A: And I think the bandanna that they found was wrapped around his neck, not around his mouth.

Q: Let me see if I understand. Is it the same bandanna that—

A: The color. All I remember was the color.

Q: The color?

A: Right.

Q: The color is the same.
A: Right.
Q: As the one that was found in the car.
A: Yeah. Exactly. Yeah.
Q: Okay. And he had that bandanna that—
A: Wrapped either around his mouth or his neck.
Q: Okay. Or a similar type.
A: Exactly.

In response to questions in respect of the gold clasp that the police report said Ingram had positively identified, Ingram's statements before the grand jury were similarly equivocal:

A: Yeah, just pieces of a broken chain, which I think belonged to Jay.
Q: You think belonged.
A: Yeah.
Q: You couldn't identify it.
A: Yeah, I can—well it wasn't part of my chain.
Q: It wasn't part of your chain. Okay.

Ingram also was not sure about the getaway car when testifying before the grand jury. He stated that "[a]ll I knew was something similar to a Monte Carlo or an Oldsmobile Cutlass Supreme." The police report had indicated a positive identification of a two-door Cutlass Supreme.

Finally, as to the jacket that was recovered from defendant's car, although not mentioned at all in the police report, Ingram testified that "[a]ll I remember it was—I know it was like a grayish jacket with, like, blue around the shoulders. So, it was a two-tone colored jacket." When asked if he gave a description of the robber's clothing to the police he stated, "[n]ot really." He also testified before the grand jury that he knew the defendant and the defendant was not the man that robbed the barbershop. He described defendant as "dark-skinned," and pointed out that the perpetrator was light skinned. However, he conceded that he could not see the driver of the getaway vehicle.

At trial, the prosecutor questioned Ingram about the fact that he did not want to testify, that he did not want to be involved, and that he was only appearing in court because investigators "had to

get you and bring you here today." Indeed, the State had been forced to make a motion for a material witness warrant after Ingram failed to appear. On requesting the warrant, the prosecutor stated, "[y]our Honor is already aware of the problems we've had with this witness. He's been previously uncooperative, he's told us on separate occasions the other two times this was listed, including this third time, that he could not and would not come in."

Ingram testified at trial that the mask the perpetrator had on had dollar bill signs on it but that the jacket he viewed at the police station and that was entered into evidence at trial was not a jacket he had ever seen anyone wearing. Ingram also testified that he had identified a little piece of chain at the stationhouse but that "it wasn't pieces of my chain. It was just little broken pieces. If he had broke my chain, it wouldn't have been broken in that type of manner" and "I don't remember what Jay's chain looked like." When asked about the getaway car, Ingram testified:

A: All I could see was the car pulling off.

Q: I mean when you went back to the police station.

A: He showed me car [sic], but I already knew what type of car he had, and it didn't look nothing like the car that pulled off that night.

Q: You already know [sic] what kind of car he had?

A: Yeah. I already knew what type of car he had.

Q: Who?

A: The man right there, sitting right there.

Q: The defendant here?

A: Yeah.

Q: You knew what kind of car he had.

A: Right. And the car—

Q: The car you saw—

A:—that pulled off that night—

Q: Was not the car that you had seen on that night.

A: No, it's not the same car. No.

\* \* \*

Q: So let me understand this. You told the police that the car you showed—that they showed to you was the car involved in the—

A: Did I tell them that? No, I didn't tell them that.

Q: You just read Detective Johnson's report.

A: Yeah, I read that statement. I don't remember telling them nothing like that.

Thus, Ingram's grand jury testimony and his trial testimony both were inconsistent with the police report. Although the State readily can demonstrate that Ingram's story varied and was peppered with memory lapses, the test for neutralization does not end with a finding that a witness presented testimony contradictory to a statement previously made. The State must show surprise, which it cannot demonstrate on these facts. Based on Ingram's unwillingness to testify, and his grand jury testimony contradicting the police report at least in part, the prosecution cannot argue that it "ha[d] no indication that [Ingram] w[ould] repudiate his prior statement." *Caraballo, supra,* 330 *N.J.Super.* at 559, 750 *A.*2d 177. *See also Gallicchio, supra,* 44 *N.J.* at 546, 210 *A.*2d 409 (finding surprise because the State "had no prior indication of [the witness's] present disposition"); *Caraballo, supra,* 330 *N.J.Super.* at 558, 750 *A.*2d 177 (stating "we regard as disingenuous the prosecution's claim that it was 'surprised' by [the witness's] testimony. After [the other two witnesses'] failure to cooperate, it was predictable that [this witness] would repudiate his statement to the police."); *Caccavale, supra,* 58 *N.J.Super.* at 572, 157 *A.*2d 21 (holding that State could not prove surprise because witness "had talked to the prosecuting attorney on the day he was to appear before the grand jury, and had told him he would refuse to identify [the defendant]. The prosecution was on definite notice that it had an unwilling witness on its hands."). This was not a case where the prosecution believed that it had a willing witness who then testified in a manner completely inconsistent with all statements previously made. *See State v. Nelson,* 318 *N.J.Super.* 242, 251–52, 723 *A.*2d 627 (App.Div.1999) (finding surprise existed in that, "[t]he day before, [the witness] had expressed his willingness to testify in accordance with his 1991 statement"); *Johnson, supra,* 216 *N.J.Super.* at 608–09, 524 *A.*2d 826 (finding surprise when witness took the stand, testified contrary to his prior statement, and admitted lying to prosecutor out of fear).

In sum, the State failed to demonstrate surprise and, therefore, neutralization was improper. Further, not only was

neutralization improper and, as a result, hearsay was put improperly before the jury through cross-examination, but also, the prosecutor was permitted to comment on that hearsay evidence as substantive evidence. Neutralization evidence may only be used to "eras[e] or cancel[ ]" surprising, harmful testimony. *Gallicchio, supra,* 44 *N.J.* at 545, 210 *A*.2d 409. It may not be used affirmatively, that is, for the truth of the matter being asserted. *Id.* at 548, 210 *A*.2d 409. Its use lies in assisting the jury only "in deciding whether to believe the testimony which the prior statement contradicts." *Ibid.*

■ In the present matter, not only did the trial judge fail to instruct the jury on this point at the time it permitted introduction of the prior contradictory statement, but the prosecutor relied on the prior identification contained within the police report. The prosecutor stated, "[w]ell, ultimately, Ingram says, yes, that's the car," "Ingram ran out of there because he didn't want to put his—give us the—he comes in here and he tells you about the car, and he tells you in one breath that he didn't identify this car. Then, yes, I did. But to the police, that's what he told them, this is the car," and "Look at all of the—and look at even the reason why he's sitting here, essentially fudging on what he had already said." The jury could have used the prior inconsistent statement in weighing the truthfulness of Ingram's trial testimony; however, the prosecutor could not rely on those statements as substantive evidence. Although the court gave a limiting instruction at the close of trial on defendant's objection to the State's summation, that belated instruction was too little and too late to overcome the prejudice to defendant from the introduction of the hearsay statements contained in the police report as presented to the jury through cross-examination.

## IV.

In concluding that defendant's conviction must be reversed, we add the following.

■ None of the State's witnesses presented at trial were able to identify defendant as the driver of the getaway vehicle. Both Ingram and the barbershop manager specifically testified that they did not see the driver of the getaway vehicle. Nonetheless, defendant argues that an identification instruction should have been given.

■ The jury is to be instructed on identification when it is a "key issue" in the case before the jury. *State v. Green,* 86 *N.J.* 281, 291, 430 *A.*2d 914 (1981); *see also State v. Davis,* 363 *N.J.Super.* 556, 561, 833 *A.*2d 1094 (App.Div.2003). The absence of such an instruction can constitute plain error when analyzed in the specific factual setting of a case. *Green, supra,* 86 *N.J.* at 289, 430 *A.*2d 914. A contextual determination of error is required; we do not apply a *per se* rule. *See State v. Cotto,* 182 *N.J.* 316, 326–27, 865 *A.*2d 660, 2005 *WL* 221185 (2005) (decided today). In this case, an eyewitness identification did not feature in the State's case. That said, we reverse today based on the neutralization error.

The judgment of the Appellate Division is reversed and the matter is remanded for further proceedings.

*For reversal and remandment*—Chief Justice PORITZ, Justices LONG, LaVECCHIA, ZAZZALI, ALBIN, WALLACE, and RIVERA–SOTO—7.

*Opposed*—None.