IN THE MATTER OF H. ALBERT HYETT,
AN ATTORNEY AT LAW.

Argued September 26, 1972—Decided November 6, 1972.

520

*Mr. Solomon Forman,* First Assistant Prosecutor, for the order (*Mr. Richard J. Williams,* Atlantic County Prosecutor, attorney).

*Mr. John W. Noonan* argued the cause for respondent.

PER CURIAM. Respondent, H. Albert Hyett, was indicted for bribery of a police officer. Respondent offered the defense of insanity and the jury acquitted him on that basis. The jury having found that his insanity continued, respondent was committed to the New Jersey State Hospital to be held "until such time as he may be restored to reason" pursuant to the mandate of *N. J. S. A.* 2A:163–3. Upon his admission, the hospital staff found no indication of mental illness, whereupon respondent applied immediately to the trial court for an order adjudging that he was "restored to reason" and directing his release accordingly. See *State v. Maik,* 60 *N. J.* 203 (1972). At that hearing the testimony was unanimous that respondent was not then ill. His release was ordered.

Upon receiving a report of the jury's verdict and the order committing respondent to the State Hospital, we suspended him from the practice of law until further order. When he was adjudged "restored to reason," we continued the suspension and ordered him to show cause why he should

not be disbarred or otherwise disciplined, the record to consist of (1) the transcript of the criminal trial, (2) the transcript of the proceedings which led to his release from the State Hospital, and (3) such further evidence with respect to any issue in the criminal case which the respondent or the prosecutor may present before a trial judge designated for that purpose. Additional testimony was presented by the respondent and returned to us.

An acquittal in a criminal prosecution does not foreclose a disciplinary proceeding based upon the same misconduct. *In re Pennica,* 36 *N. J.* 401, 418–419 (1962). Respondent does not question this proposition. Nor does respondent question the jury's finding that he did commit the forbidden act. Rather he contends he was legally insane when he did so, as the jury found, and the further testimony he offered in these disciplinary proceedings was addressed to that issue. Since the claim of insanity can be weighed only in the context of the criminal event, we will state the facts at some length even though they are not disputed before us.

I

On August 20, 1970 a young lady complained to Officer Friel of the Atlantic City police department and Trooper Crawford of the New Jersey State Police that a resident in her apartment house took her pocketbook. She identified Orson Leb Moses as the culprit. The officers found Moses outside the apartment house. He denied the theft and according to the officers consented to and indeed invited a search of his apartment. The search failed to disclose the pocketbook but did reveal prescription legend drugs and some pipes apparently used to smoke marijuana. The trooper testified that Moses' eyes were glassy and the pupils appeared dilated. Moses was arrested for possession of the drugs and paraphernalia. We gather that although he con-

tinued to deny the theft, Moses gave the girl the small sum she said was in the pocketbook, whereupon she lost interest in her complaint.

Moses, a citizen of Canada, was a student in the United States. He apparently had a summer job in Atlantic City. Respondent was retained to represent him. Bail was fixed at $1,000. Moses failed to appear on August 26, 1970, and his bail was forfeited. Apparently the father of Moses thereafter pressed respondent for a disposition of the charges.

Officer Friel said that on August 26, 1970 (the date Moses failed to appear), respondent commented that the case did not involve much, and asked Friel if there was anything Friel could do to help him with the case. Friel made no response. On a number of later occasions when Friel saw respondent around the courts, respondent repeated his inquiry as to whether Friel could help him dispose of the matter. Respondent also talked with Friel about a charge against another man (Polillo) whom Friel and Crawford had arrested. Friel kept his superiors informed of what he considered to be approaches for attempted bribery. After thus probing Friel over a period of time, respondent asked Friel to telephone him at his office about the Moses case. This led to the first of four taped conversations between Friel and respondent.

The first tape was of the telephone call Friel made on January 8, 1971 in response to the respondent's request we just mentioned. The conversation was brief and to the point. Friel asked "Do you want to stop here, or do you want me to meet you somewhere?" Told Friel was at home, respondent took his address and said he would be there in 20 minutes and blow his horn. Friel mentioned "Moses" and respondent said "Yeah. There's nothing to the damn thing and it's laying around and a damn nuisance." Respondent drove to Friel's house. Friel joined respondent in the car, and according to Friel:

"* * * Mr. Hyett stated that if I could steal the case from Sergeant Mucci's office that he would give me a half yard [$50] and to get rid of the pills also. And I was to bring the evidence to his house and that he also had a bottle for me. He also stated that it was up to me to take care of Perone [the judge of the municipal court]. He stated that the kid was away at college and that if I stuck with him, we would have many more cases together and that we would get a big score."

Three days later (January 11) Friel telephoned respondent. This conversation too was recorded. Friel told respondent that he arranged to be transferred to the night shift, saying "That way I can get into the office. It is impossible to go in in the daytime," to which respondent commented "Yes, right." Friel continued, "So they leave around 3:00 A.M. and I work until six. I will get them sometime this morning." Friel asked when he should call and where they would meet. Respondent said, "Give me a call and I will see you personally. All right?"

Two days later (January 13), Friel called respondent. The recorded conversation was brief. As soon as Friel identified himself, respondent said "Oh yeah. I am going to leave now, Mike. I can only stay for a second. My daughter is rehearsing. I'm late. All right?" Respondent said he would meet Friel outside Friel's house. "I'll blow the horn."

When respondent reached Friel's home and came to the door, Friel induced him to come in. The ensuing conversation was recorded. The tape opens with the barking of dogs. There were two, one a German shepherd Friel used in his police work. Respondent was concerned about the police dog. After ordering the dog back, Officer Friel addressed respondent:

"OFFICER FRIEL: He won't bother you. He is used to everybody being here.
MR. HYETT: I left my motor running.
OFFICER FRIEL: All right. How about a little —
MR. HYETT: Give me a fast one. Just a shot, Mike.
OFFICER FRIEL: What do you want, brandy?

MR. HYETT: No, just a little scotch. Did you take care of it all right?

OFFICER FRIEL: Yep.

MR. HYETT: Just a little shot, Mike. Here is your Christmas present."

The "Christmas present" was a Christmas envelope containing the promised $50.

The conversation turned briefly to the dog, his origin and training. Respondent explained that he had to get home because his daughter was in a play and rehearsed every night at the high school. Friel said "All right. I got the case. I didn't get the pills, though," saying they were at the laboratory. Respondent asked, "Well, suppose they come back?" Friel answered "It doesn't matter because the file is not here." Friel noticed "Jacob Green" written on the Christmas envelope and respondent explained that "I took it in a hurry." Respondent struck the name "Jacob Green" and wrote "Mike."

Friel then asked respondent if the possession of prescription legend drugs was an indictable offense. Respondent said it was not, and that he could get a doctor's certificate to account for the possession but "This kid is going to school and I don't want to bring him back if I don't have to."

Friel then asked "Is this coming out of your pocket?" Respondent replied, "Where else? That's right." Friel said "What the hell, why don't you get it from him and—" Respondent interrupted, saying "I can't get it from him. His old man called me and asked why the kid's case has been kicked around and all that shit."

Friel then mentioned that the State Trooper is involved in the case. Respondent asked, "How's he in it?" Friel said "He went in on the search with me." Respondent answered "Yeah, but you had no warrant." Friel pointed out that "the guy told me it was okay for me to come in the apartment. That's what he told the trooper." Friel then left respondent momentarily to get the reports he had ob-

tained from Sergeant Mucci. When he returned respondent asked a few questions about the dogs and inquired also about Friel's family. Friel returned the conversation to Trooper Crawford and wanted to know what to do "if he starts bugging me about the case." Respondent suggested "You don't know. The file got lost" and added that Crawford would have no interest in the case. At this point, Friel pretended to be reluctant:

"OFFICER FRIEL: I just don't want to get fucked up in this thing.

MR HYETT: If it's going to fuck you up, bring it in, that's all. And let's try this thing. I don't want to get you fucked up, Mike.

OFFICER FRIEL: No, it's not that, it's . . . ah —

MR. HYETT: It's a petty thing. For Christ sake, look. I can beat it on a search warrant.

OFFICER FRIEL: Yeah, it's petty, but what the fuck, he ain't comin' up with nothin' and he wants to get off with everything.

MR. HYETT: I could have done something this summer, but the son of a bitch went to Florida afterwards and the (word inaudible) took him away.

OFFICER FRIEL: You'll wind up taking it out of your own pocket and —

MR. HYETT: That's okay. We'll wind up making it back on something else. You'll have some other stuff coming up, won't you? We'll make a little score or something.

OFFICER FRIEL: Well, we are waiting on the Polillo thing now, you know.

MR. HYETT: Yeah. Well, shall I see —

OFFICER FRIEL: (An inaudible portion of the tape.)

MR. HYETT: He made a motion, didn't he?

OFFICER FRIEL: Yeah, he made a motion.

MR. HYETT: I wonder what happened to that motion.

OFFICER FRIEL: He got another attorney in there.

MR. HYETT: (An inaudible portion of the tape.)

OFFICER FRIEL: Yeah.

MR. HYETT: I know. Listen, check with me."

Apparently referring to the Christmas envelope containing the money, the transcript reads:

"OFFICER FRIEL: Do you want to keep this?

MR. HYETT: No, no, put it in your pocket. It's all right. You know we are all right, right?

OFFICER FRIEL: Yeah, we're all right.

MR. HYETT: Put it in your pocket.

OFFICER FRIEL: You know, what the hell, if it's coming out of your pocket . . .

MR. HYETT: Don't worry about it. Listen. Now this thing is dead then. It will not be coming up then, right?

OFFICER FRIEL: Yeah. What about Perone? Now it's going to have to come up. Now what should I tell Perone?"

At that point Friel handed respondent a copy of the report obtained from Sergeant Mucci's file. Hyett first responded to the offer of the paper saying "You hide it yourself," but Friel said he did not want to keep it. Respondent noted that "You didn't give me the original. * * * A copy, that's all. Look." Returning to Friel's question as to what Friel should tell Judge Perone when the case comes up, respondent continued:

"MR. HYETT: * * * Now the next question is, what if it comes up? What do you want from me? That's your headache. That's up to you.

OFFICER FRIEL: Yeah, but I ain't never done — you know — I'm not. . .

MR. HYETT: So, suppose it does come up?

*      *      *      *      *      *      *      *

OFFICER FRIEL: Okay. What should I tell him. I don't have the case, your Honor. I don't have the case.

MR. HYETT: You don't have it, that's all."

Friel and respondent then discussed the likelihood of the case getting back on the calendar. Respondent asked if other copies of Friel's report were around and Friel assured him, "Not as far as I know." The transcript concludes with the following:

"MR. HYETT: All right. So when it comes up, we'll work on it, of course. We will plead not guilty and you just say you just walked in and that you didn't have any search warrant. That's all. You had no search warrant and he will throw it out that way.

OFFICER FRIEL; What? You are going to ask me if I had a search warrant?

MR. HYETT: Yeah.

OFFICER FRIEL: Well, what about the thing that says . . . I put on a thing that says I . . . well, that won't be there.

MR. HYETT: No. He denies it.

OFFICER FRIEL: What?

MR. HYETT: He denies it. He never gave you permission.

OFFICER FRIEL: He denies that he gave me permission?

MR. HYETT: That's right.

OFFICER FRIEL: Now what if Perone says, 'What about the trooper? Bring the trooper in.'

MR. HYETT: Just say you had another officer. You took another officer. You could have brought ten troopers. You don't have no search warrant. That don't mean nothing.

OFFICER FRIEL: But if the trooper . . . if he forces me to bring him in, he's going to say he okayed the search.

MR. HYETT: He's going to say what?

OFFICER FRIEL: He okayed the search.

MR. HYETT: He will never in a million years say he okayed the search. He will deny it.

OFFICER FRIEL: I mean the trooper.

MR. HYETT: He can't okay the search. How can he okay the search, Mike? Do you want this thing or . . .

OFFICER FRIEL: Yeah. I'll . . . ah, no, I just want, you know, to . . . you know, what the hell for fifty bucks I just don't want to . . . ah . . . I want everything to go right. Look. I don't know too much about this shit. Do you understand?

MR. HYETT: If you have any ill feelings about it, don't fuck around. Don't bother. There is no way they can . . .

OFFICER FRIEL: Look. I like to make a dollar. I like to make a note.

MR. HYETT: Well look. Let's not make such a big deal about the thing. As far as I can see, the thing was the kid was fucking around with these girls and the girls made some beef about a wallet or something.

OFFICER FRIEL: Right. Nine dollars stolen from the wallet.

MR. HYETT: Now he denies knowing the girls. And you'll never get the girl in here. She'll never back you up. What the hell is it to it?

OFFICER FRIEL: All right. Okay.

MR. HYETT: Keep in touch with me, Mike. Let's make a good one and make some dough, you hear?

OFFICER FRIEL: I hope so."


## II

We come then to the question of insanity. We will speak first of the record of the criminal trial.

It will be recalled that the bribe was paid on January 13, 1971. Respondent was admitted to the Thomas Jefferson University Hospital in Philadelphia one week later, on

January 20. It is clear that before that date Hyett learned he was to face a charge that he bribed Officer Friel. The hospital record reflects that respondent was admitted because of symptoms suggesting a heart problem. He had a history of hypertension and myocardial infarction in 1965.

Respondent was first seen by a psychiatrist, Dr. William A. Rutter, on January 25, five days after hospitalization. In the meantime respondent had consulted with counsel. We mention this fact to emphasize respondent's awareness of and concern with his criminal involvement. Dr. Rutter said he was called into the case by the attending cardiologist. Dr. Rutter's diagnosis was "depressive reaction," which he defined as a "syndrome that consists of loss of interest, loss of appetite, insomnia, inability to concentrate, a feeling of guilt and remorse, indecisiveness, hypersuggestibility and if severe enough, suicidalideation, a feeling of worthlessness and of self-blame." Dr. Rutter first gave anti-depressant medication and then prescribed a course of ten electroshock treatments which were administered over a period from February 2 to February 19. Respondent was discharged from the hospital on February 21. Dr. Rutter saw respondent on an outpatient basis. Respondent was hospitalized again from March 11 to March 27, 1972 because of an alleged suicidal threat.

The medical witnesses agreed that respondent did not suffer from a psychosis. Rather he was depressed. There were two obvious questions — whether respondent was depressed prior to learning of his criminal involvement and whether, if he was depressed at the time of the crime, that depression rendered him legally insane, i. e., whether "at the time of committing the act, the accused was laboring under such a defect of reason, from disease of the mind, as not to know the nature and quality of the act he was doing, or if he did know it, that he did not know what he was doing was wrong." State v. Maik, supra, 60 N. J. at 212.

Dr. Rutter's testimony was less than satisfactory because he had made no record of much of the material to which he

testified about a year and a half later. Nonetheless we do not doubt his testimony that respondent was depressed when he saw him on January 25. The prospective charge of bribery was alone adequate to account for a depression. No medical witness suggested it was not. Rather the defense medical witnesses accepted as true the history given them that respondent's depression began with the suicide of respondent's sister on July 18, 1970, about one month before respondent first approached Friel with respect to the charge against Moses. As we will mention later, it is not clear how much of the history was obtained by the doctors from respondent rather than his wife. Respondent did not testify at the trial. His wife did, and her testimony encompassed most of the elements of the depression syndrome as defined by Dr. Rutter.

Dr. Rutter expressed no opinion as to respondent's sanity at the time of the criminal event. The only defense witness who expressed an opinion was Dr. Matthew T. Moore who, on March 9, 1972, long after the critical events, saw respondent at the request of counsel and for the purpose of trial rather than treatment. He too found no evidence of psychosis, but he found a severe depression, which, he said, is "a disease of the mind as is recognized in forensic medicine."

Dr. Moore said "a severe depression is one in which the individual is withdrawn, sad, melancholy, who shows what is termed in psychiatric parlance a diminution or marked slowing of psychomotor activity; that his physical activity is reduced and his mental activity is reduced, retarded. He is suffering from a feeling of hopelessness, confusion, sometimes futility, and may entertain ideas of self-annihilation." He said "there is very frequently a distortion of the reasoning process, at times an inability to reason appropriately, and there is also in these individuals a state of suggestibility." He added that "The effect upon the mind is that the individuals are frequently unresponsive. You may talk to them and they may not respond properly. They often per-

form repetitive, meaningless acts because of the internal state of inadequacy and a sense of inferiority which is a very characteristic feature of depression. As a result, there is a distortion or aberration of the thinking process and of the acting process." The doctor concluded that respondent "was in a mental state at the time of the alleged episode, of such confusion that he was unable to understand the nature and quality of his acts and the consequences of his acts" and that "He might have understood right from wrong, but he was unable to carry out what his mind dictated"; that "as a result of the confusional state, his depression, and the resultant symptoms thereto," he could not have conformed his conduct to the standards of law.

That opinion was based upon an hypothesis which included "the circumstances of the alleged offense and charge" and all "the evidence that has been presented here in court." The witness did not suggest that he had any expert basis for knowing what part of the hypothesis was true. He simply assumed the truth of the history, including factual matters not supported by any competent evidence in the case as we will presently point out.

Dr. Moore's opinion cannot be squared with the taped conversations. We listened to the tapes. Nothing in respondent's manner or in the content of the conversations suggests respondent was confused in the least. He was aware of the legal issues in the Moses matter and alert in his scenario of how the Moses matter should be handled. It is unmistakable that respondent appreciated the criminal quality of the arrangement he was making with Friel. Indeed Friel's pose that he, Friel, was fearful of the possible consequences, accentuated the criminal quality of the plan and respondent's awareness of it.

■■ Dr. Moore did not find evidence of legal insanity in respondent's speech in the taped conversations. He found that evidence in the content of the conversations and in doing so he went far beyond his medical expertise unless we err grievously as to the limits of psychiatric knowledge.

An expert witness should distinguish between what he knows as an expert and what he may believe as a layman. His role is to contribute the insight of his specialty. He is not an advocate; that is the role of counsel. Nor is he the ultimate trier of the facts; that is the role of the jury or the judge, as the case may be. The trier of the facts may be misled if the expert goes beyond what he can contribute as an expert. It is not unlikely that the jury was thus misled in this case.

The thrust of this criticism is evident from an analysis of Dr. Moore's testimony. Dr. Moore made these points:

▮ (1) The Moses case was "a case of no unusual consequence * * * in which a young man was accused of having stolen some money from a girl and he is called to defend the individual" and hence it was incongruous to seek to bribe the officer. In fact, theft was not the charge; but the point to be noted is that whether the Moses case was of no unusual consequence was hardly a medical question. The drug charge carried a maximum of six months and a fine of $500. There was no medical basis for a finding that the charge was of no unusual consequence to the student or his father or to the attorney retained to defend against the charge.

(2) Respondent told Dr. Moore that there was only $5 in the envelope, which he intended to give to a cleaning man for Christmas. Since the testimony showed the envelope contained $50, it must follow, said Dr. Moore, that respondent was "confused." Again, Dr. Moore was speaking as a trier of the facts rather than as a medical expert. A trier of the facts could conclude, as we do, from this and from other circumstances to be related, that respondent lied to Dr. Moore, and a finding that he lied would preclude a finding that he was confused.

▮ (3) It will be recalled that when Friel noted the name "Jacob Green" on the envelope, respondent struck the name and wrote "Mike." Since, in the witness's view, "a man who is astute, acute in his thinking and who would

recognize right from wrong" would not have placed "Mike" in his own handwriting, "this is an indication that there must be something mentally wrong with the capacity to reason of a man of this type to expose himself to jeopardy by writing in his own handwriting." Again that observation can have no medical base. Criminals do leave clues, and especially with someone trusted as a conspirator. Indeed it may be that the name "Jacob Green" on the envelope was no less inculpatory than "Mike."

(4) To show "there was defective reason and a marked question of suggestibility," Dr. Moore referred to repeated telephone calls from Friel to respondent. "This is a process of actual hypnosis." Dr. Moore continued that "This produced a state of harassment, suggestibility * * * it can produce a confusional state in which a disorder of reason can and does occur." Dr. Moore's factual assumption was that Friel pursued respondent and solicited a bribe. The only basis for that assumption was statements Dr. Rutter attributed to respondent, that respondent had a "picayune" case; that Friel approached him, saying "Al, you don't feel good. Why do you want to bother with something like this? Let me take care of it"; that respondent did not even answer Friel; that "he was approached on at least a dozen or more occasions by the officer going in and out of court again to take care of this for him," and that in respondent's own words, "I would have done anything to get him off my back and I agreed." There was no testimony whatever that Friel pursued respondent, and that version is plainly at odds with the taped conversations. Indeed Friel pretended to be the reluctant recipient of a bribe; it was respondent who pressed the matter. We think it evident that if Dr. Rutter was accurate in his unrecorded recollection, respondent at that time intended to assert the defense of entrapment, a defense he later could not advance in the face of the tapes. The same observation must be made as to the claim, attributed to respondent in Dr. Moore's testimony, that the envelope respondent handed Friel on January 13

(which of course was 19 days after Christmas) contained $5 intended as a Christmas gift for a cleaning man. And so too with respect to the statement Dr. Moore attributed to the respondent, that when he came to Friel's house "Officer Friel gave him four or five drinks and then enticed him to talk about the case." That statement was false, as the tapes plainly show. It of course was not a medical function to weigh the truth of those assertions even if they had been supported by competent evidence. The finding of "hypnosis" has no basis in the record. (In passing we note that the statement Dr. Rutter attributed to respondent, that Friel and respondent met in court on so many occasions, shows that respondent attended court with some frequency between the date of his sister's death and the date of the crime, contrary to the thrust of the testimony of respondent's wife that he was unable to attend to professional matters. It may further be noted that none of respondent's office associates testified.)

■ (5) The tape reveals that respondent told Friel that "I could beat it on a search warrant." This being so, Dr. Moore concluded it is a distortion of reason to pay money. "It's a disease, or as I prefer to call it, an aberration disorder of the mind." Later he said it was evidence of "confusion" that respondent thus "reversed himself." The witness was beyond his specialty. A lawyer would know that a search warrant is not necessary when the search is consented to, and that in the circumstances of the Moses case, it would be no easy matter to overcome the testimony of Friel and Trooper Crawford that Moses did consent. In short, respondent's boast is readily understood as part of his effort to persuade Friel that respondent was a good fellow trying to spare the student some inconvenience and discomfort at respondent's own expense.

■ (6) Dr. Moore thought an "astute" individual, intending "with malice aforethought and with criminal intent" to "fix" a case, would "come directly to the point, state his case, produce whatever he wished to do and get out." In-

stead, referring to the tape, Dr. Moore said respondent "made some irrelevant comment about the dog, about the officer's children, instead of coming directly to the point. This is an indication that this man was confused. An astute, alert attorney would not make such a statement, in my estimation." In fact, respondent did go "directly to the point." At any rate, the proposition seems to be that there is a rational way to commit the crime of bribery, and that a departure from that script will evidence mental illness negating an awareness of what is done. We know of no scientific basis for Dr. Moore's formula. We find nothing strange in the manner in which respondent committed the offense.

(7) Finally, Dr. Moore found "complete and glaring disproportion between the relatively minor infraction of the defendant's client, which would have been adequately resolved in a court of law through the usual legal channels, and the ultimate action of the defendant represented in the light of the totality, that is, the entire evidence." Apart from the apparent assumption that Moses would have to be acquitted on a trial, Dr. Moore overlooked several facts. One is that we do not know what fee arrangement respondent had with Moses or his father. Another is that the transaction had a larger thrust — an arrangement for future transactions with Friel involving greater profit. One such matter was already in the courts, as the tape reveals. Indeed respondent's last words to Friel were: "Keep in touch with me, Mike. Let's make a good one and make some dough, you hear?"

Dr. Moore's testimony comes close to the proposition that a lawyer of good reputation would not stoop to bribery, and hence if he does, his misconduct is evidence of mental illness. If that proposition is good medicine, which we doubt, surely it is not good law. That proposition would sub-

stantially deny all criminal accountability. We know of no concept of criminal responsibility which accepts it.[1]

For the reasons we have given, we find nothing in Dr. Moore's testimony to support his final conclusion that respondent was insane under the law's definition of accountability. Apart from the vulnerability of his opinion because of its dependence upon facts which are not in evidence or which are not credible, we think Dr. Moore went beyond his expertise. We are more impressed with the testimony of Dr. Yaskin for the State that he could not express any professional opinion with respect to respondent's capacity at the time of the crime on the basis of his examination of respondent so long after the offense (Dr. Yaskin examined respondent nine days after Dr. Moore did) and the hypothesized history.

We are thoroughly satisfied from the testimony at the criminal trial that respondent knew precisely what he. was doing and the criminal quality of his conduct. The remaining question is whether the testimony given at the later hearings casts any doubt upon the correctness of that finding. We are satisfied it does not.

The hearing on respondent's release from the State Hospital sheds no light on this issue.

At the hearing in these disciplinary proceedings respondent testified for the first time. He denied any recollection of the criminal event or its antecedents. Dr. Samuel Halpern, a general practitioner to whom respondent referred clients involved as claimants in accident litigation, testified that he treated respondent for a heart attack in 1965 and for injuries sustained in an automobile accident in 1968.

---

[1] We note that the *Model Penal Code* (Proposed Official Draft, May 4, 1962) formula of legal insanity deals with a kindred proposition and carefully provides in section 4.01(2):

"As used in this Article, the terms 'mental disease or defect' do not include an abnormality manifested only by repeated criminal or otherwise antisocial conduct."

He said he next treated respondent from July 18, 1970, the date of the death of respondent's sister, until December 4, 1970 when the witness went on vacation. He testified to respondent's depression and that he urged psychiatric consultation. He said, too, that clients referred by respondent told him respondent would do such things as picking up the wrong file or asking them to pray with him. He could not name them and none testified. Dr. Halpern had not testified at the criminal trial. Counsel for respondent stated that he was not called "because of a lapse on my part." We note that at the criminal trial Dr. Moore included in the list of medical reports submitted to him several reports of Dr. Halpern, the last of which was dated November 29, 1969, which was prior to the death of the sister. Dr. Rutter testified again, and for the first time testified to his opinion as to respondent's sanity at the time of the criminal act, finding him incapable of the required understanding. Dr. Moore testified in harmony with his prior testimony, this time expressing his opinion in terms of respondent's capacity to comply with the code of ethics at the time of the criminal event. Both Dr. Rutter and Dr. Moore agreed their opinions in any event depended upon the truth of the histories given them.

Nothing in the additional testimony raises any doubt with respect to our finding that respondent was legally sane at the time of the crime.

We add a final word about respondent's testimony that he could recall no part of his transactions with Friel. Our decision would not be changed if we accepted that testimony as true, but we cannot credit it. We refer to the subject because it was stressed in the oral argument and counsel later transmitted a letter from Dr. Moore with respect to it.

Dr. Rutter testified at the criminal trial that the electro-shock treatments resulted in retrograde amnesia for a period of three to four weeks before respondent's admission into the hospital. That period encompassed the criminal events of January 8, 11 and 13, 1971. There was nothing in Dr.

Rutter's testimony to indicate the claim of loss of memory was other than subjective. Dr. Yaskin testified that when he examined respondent in March 1972, respondent said he had a faint recollection of entering Friel's home, whereupon, in Dr. Yaskin's words, Dr. Rutter interfered with the examination by saying to respondent, "Do you recall going into the house?", to which respondent answered that he did not. The interruption ended that avenue of examination.

Retrograde amnesia, as a passing phenomenon, is well known, but respondent's claim that his loss of memory was total a year and a half after the treatment seems extraordinary. After the oral argument, counsel for respondent sent us a letter to him from Dr. Moore to support the claim in terms of known medical experience. In that letter Dr. Moore did not assert that respondent experienced a total irretrievable loss of memory; he expressly left that subject with Dr. Rutter. Dr. Moore's letter included some medical references which, as we understand them, would not give solid support for an enduring retrograde amnesia such as respondent claimed. On the basis of what is available to us, the phenomenon would be extraordinary indeed. See 3 *Gray, Attorneys' Textbook of Medicine* (3d ed. 1971) § 64A.06, pp. 780.8–780.9. But we need not pursue that medical question. Respondent's claim is subjective and we do not credit it, especially in the light of Dr. Moore's explicit testimony at the criminal trial that he did draw out a history from respondent with respect to the criminal event.

It is regrettable that a long career at the bar should come to this end, but respondent's attempt to corrupt the judicial process requires disbarment. *In re Goode*, 58 *N. J.* 420 (1971). His name will be stricken from the rolls.

*For disbarment*—Chief Justice WEINTRAUB, Justices JACOBS, PROCTOR, HALL and MOUNTAIN, and Judges CONFORD and SULLIVAN—7.

*Opposed*—None.