STATE OF NEW JERSEY, PLAINTIFF-APPELLANT, v.
FLOREN DiPAGLIA, DEFENDANT-RESPONDENT.

Argued September 25, 1973—Reargued January 21, 1974—
Decided February 5, 1974.

*Mr. Elson P. Kendall,* Assistant Prosecutor, argued the cause for appellant (*Mr. Karl Asch,* Union County Prosecutor, attorney).

*Mr. Barry M. Epstein* argued the cause for respondent (*Mr. Hyman Isaac,* of counsel; *Messrs. Reibel, Isaac, Tannenbaum & Epstein,* attorneys).

The opinion of the Court was delivered by

SULLIVAN, J. Defendant was tried by jury and convicted of armed robbery, theft of a motor vehicle, assault with intent to kill a police officer and carrying a weapon without a permit.[1] He received sentences aggregating 12 to 15 years in State Prison and was fined $10,000. On appeal to the Appellate Division, his conviction was reversed on the ground that the prosecutor's conduct and comments during trial and summation exceeded the perimeters of fair play, and prejudiced defendant's rights to a fair trial.[2] This Court granted certification. 63 *N. J.* 257 (1973).

The basic facts on which the criminal charges were based are not disputed by defendant, his sole contention being that he was insane at the time he committed the acts charged. This affirmative defense was presented through the testimony of a number of lay and medical witnesses. Defendant did not take the witness stand in his own behalf.

The State's evidence showed that on September 18, 1969, Mrs. Irene Margules, while at home, was talking with a friend of hers on the telephone when her front door bell rang. She called to her housekeeper to answer the bell and then told her friend to hold on for a minute while she went to see who was at the door. Mrs. Margules put the phone down and walked over to the top of the stairs where she saw a man on

---

[1] A previous trial on the same charges had ended in a hung jury.

[2] Following the reversal of his conviction, defendant was released on bail.

the stairway. The man said he was from the tax department. (At trial defendant was identified by Mrs. Margules as the man in question.) After Mrs. Margules told defendant to wait downstairs, he pulled a gun out of a briefcase he was carrying, came upstairs, and demanded to know where the jewelry was. Without reciting all the details, it is enough to note that defendant, and an accomplice named Parks, took Mrs. Margules's watch, ring and money at gun point and then used plastic tape, which they had brought with them, to tie up Mrs. Margules and her housekeeper, leaving both women on the bedroom floor.

In the meantime, Mrs. Margules's friend, who was still holding the phone, heard enough of what was going on to realize that an armed robbery was in progress. She immediately called the police and reported what she had heard.

Lieutenant Kennedy, the first officer to arrive, entered the house, saw defendant and identified himself as a police officer. Defendant whirled around with a gun in his hand and pulled the trigger, but the gun did not fire. Defendant then ran out of the house to a car and for the second time turned and attempted to fire the gun at Kennedy who was pursuing him. Again the gun misfired.[3] Kennedy then arrested defendant at gunpoint. Mrs. Margules's watch and ring were found in defendant's pocket. The accomplice escaped.

In an oral statement made to a police officer sometime later, defendant said that prior to the robbery he had first seen Mrs. Margules in Miami, Florida, while she was in a ticket line at the airport and noticed that she was wearing expensive jewelry. While waiting in line he obtained Mrs. Margules's address from one of her children who was with her and wrote it in his notebook. Defendant also said that his accomplice

---

[3]It was later shown that the reason the gun did not fire was that the clip containing eight bullets was not fully seated by about one-quarter of an inch, causing a lack of alignment which made it impossible for a bullet to be moved from the clip and into the firing chamber of the gun.

Parks was a "muscle man" he had used to collect gambling debts.[4] The robbery was planned, according to defendant, because he was quite a bit in debt and while going through his notebook had come across Mrs. Margules's name and remembered the expensive jewelry she had worn.

At trial, evidence was produced on behalf of defendant to the effect that the DiPaglia family had several successful business enterprises, and that in September 1969 (when the Margules robbery took place) defendant's net worth in these ventures was in excess of $360,000.

On his appeal to the Appellate Division, defendant raised some thirteen points, many of which were subdivided into numerous specifications of alleged error. We have reviewed these contentions and, without detailing each and every one of them, conclude that no reversible error has been shown as to any or all of them. We find it necessary to comment only on the trial court's charge dealing with the defense of insanity, and the conduct and comments of the prosecutor during trial and summation which the Appellate Division found to constitute reversible error.

The trial court in charging the jury on the defense of insanity said the following:

Under our law all persons are presumed to be sane and, therefore, responsible for their conduct, unless and until the contrary is established.

Insanity is an affirmative defense, and the burden of proving it clearly by a preponderance of the evidence is on the defendant urging it as a defense. If there is no preponderance of the evidence of insanity in the case, the defense of insanity fails and the presumption of sanity is not rebutted. In such case, the defendant stands in the position of a sane man responsible, on all of the evidence in the case, for all of his acts, whatever you may find them to have been.

---

[4]We were informed at oral argument that Parks, who was apprehended subsequent to DiPaglia's arrest, pleaded guilty to a charge of armed robbery.

It also charged:

The presumed sanity of a defendant is not overcome until you determine that the defendant has sustained his burden of proving by a preponderance of the evidence that at the time of the offenses alleged he was insane under the legal definition of insanity and, therefore, is absolved of responsibility for conduct for which he would otherwise be responsible under our law.

Defendant had objected to any charge of a presumption of sanity. In the alternative he requested that if the court did mention such presumption, the jury be charged that the presumption was not evidence of sanity, could not be treated as such by the jury, had no probative force, and disappeared from the case once evidence of insanity was introduced. As noted above, while the trial court did mention the presumption of sanity, it did not use the language requested by defendant.

Preliminarily, defendant argues that by the use of the word "clearly" in its charge, *supra,* the trial court increased the burden of proof required to sustain the defense of insanity. No such objection was made at trial and we find no error. In its overall charge the court emphasized that defendant's burden of proof was "by a preponderance of the evidence" which the court defined. In the portion of the charge complained of the phraseology is poor, but the meaning is quite clear. No increased burden of proof was imposed on defendant. See *State v. Maioni,* 78 *N. J. L.* 339, 342–343 (E. & A. 1909).

New Jersey adheres to the rule that in a criminal case the State does not have to prove that the defendant is sane. If insanity is raised as a defense, the defendant has the burden of proving insanity and unless he does so by a preponderance of the evidence he stands in the position of a sane person responsible in law for his actions. In discussing this principle cases refer to the presumption of sanity which must be rebutted or overcome if the defense is to prevail. *State v. Cordasco,* 2 *N. J.* 189 (1949); *State v. Scelfo,* 58 *N. J. Super.* 472 (App. Div. 1959).

■ The expression "presumption of sanity" used in these cases is not precise because we are not dealing with a true presumption in the evidentiary sense. See *New Jersey Rules of Evidence, Rules* 13 and 14 and Comments. All that is really meant is that a defendant asserting a defense of insanity has the burden of proving such defense. This is the context in which the cases use the expression and in which trial courts charge on the defense of insanity. It has never been understood to be a true presumption which affects the burden of going forward with proof, but rather a principle of substantive law fixing the burden of proof. *McCormick, Evidence,* (2d ed. 1972), § 346, *p.* 830. The trial court did not indicate otherwise when it charged the jury herein that "If there is no preponderance of the evidence of insanity in the case, the defense of insanity fails and the presumption of sanity is not rebutted. In such a case the defendant stands in the position of a sane man * * *."

■ ■ In the light of the foregoing, reference to the presumption of sanity by the trial court herein was not error. However, the better practice would be not to use the expression at all. Instead, the jury should be charged that, since everyone is *assumed* to be sane, a defendant in a criminal case who pleads insanity as a defense, has the burden of proving such defense by a preponderance of the evidence.[5]

We turn to the prosecutor's conduct and comments during trial and summation, which the Appellate Division found to exceed the perimeters of fair play and constituted reversible error. In order to evaluate the prosecutor's conduct some consideration must be given to the defendant's trial tactics.

The undisputed facts surrounding the robbery indicated it was a vicious, carefully planned event. Defendant had enlisted the aid of his "muscle man," Parks. The two men

---

[5] We are not disposed at this time to reconsider our previous holdings that this burden rests on and remains with defendant. *State v. Cordasco, supra; State v. Scelfo, supra.* However, see Proposed New Jersey Penal Code 2C:4-1, 2C:4-3, 2C:1-12(b), and Commentary.

had come to Newark by plane, using fictitious names to purchase tickets. They registered at the Newark Airport Motel, also under assumed names. They then stole a car and proceeded to the Margules home. There the two men gained admittance to the house by a ruse, robbed Mrs. Margules at gun point and tied up the two women. When the police officer came on the scene, defendant twice attempted to shoot the officer before he was placed under arrest.

The defense was that this episode was indicative of bizarre conduct on defendant's part which began about 1963 or 1964 and eventually resulted in his family relieving him of any business authority in 1968. As noted, there was testimony that defendant's net worth in various family enterprises was in excess of $360,000. Defense counsel argued that since defendant was not in need of money his conduct could only be explained as a manifestation of some mental infirmity. Supporting expert medical testimony reviewed defendant's behavior, including the incident in question, and concluded that he was a paranoid schizophrenic who on the date of the crime either did not realize that what he was doing was wrong, or if he did, was unable to appreciate the extent of the wrong.[6] In his summation defense counsel characterized defendant as a person who really would not do harm to anyone and suggested that defendant knew the gun he fired at the officer was not working.

It was against this background that the prosecutor told the jury that defendant was crazy like a fox. Responding to defense counsel's comment during summation that defendant

---

[6]The psychiatric opinions of defendant's experts were based essentially on what defendant told them during interviews they had with him, as well as his behavior during the interviews. As heretofore noted, defendant did not take the witness stand. The probative value of such opinions was, of course, dependent upon whether there was independent credible proof of the verity of what defendant said and did during the interviews. *State v. Lucas*, 30 *N. J.* 37, 79–80 (1959) ; *State v. Maik*, 60 *N. J.* 203, 208 (1972) ; *In re Hyett*, 61 *N. J.* 518, 527–537 (1972).

would not really harm anyone, the prosecutor said "* * * we know, for example that he was a leg breaker."[7] He went on to argue that the defense of insanity was a carefully contrived fabrication to avoid defendant's criminal responsibility. He urged the jury not to be sold a bill of goods, not to buy the Brooklyn Bridge, and let defendant get away with armed robbery because he was wealthy. He attributed defendant's criminal activity to his being an inveterate gambler who had incurred large monetary losses.

Within the confines of this opinion it is not practical to set forth each and every detail of the prosecutor's conduct and comments to which objection is now made. In addition to the allegedly improper summation, defendant contends that the prosecutor, during the trial, asked unfair questions by assuming facts which he did not prove and were not true, and constantly deprecated defendant, defense counsel and defendant's witnesses by innuendo, remarks and comment.

One incident, stressed by defendant as illustrative of the prosecutor's alleged misconduct, involved the cross-examination of defendant's brother on the subject of whether defendant had been barred from a golf club in Iowa for gambling. (As noted, defendant, although present in court, did not take the stand as a witness.) When defense counsel asked if the prosecutor had proof of the fact, the latter replied: "I spoke to the pro at the club yesterday." This statement made in the presence of the jury was clearly improper and the court responded immediately by reprimanding the prosecutor and telling the jury to disregard the question and answer.

Despite counsel's argument to the contrary, no real prejudice to defendant is shown to have resulted from the prosecutor's improper statement. The test is whether the incident is "clearly capable of producing an unjust result."

---

[7] Dr. Driscoll, a defense psychologist, had testified that defendant told him that while in military service he had broken someone's leg in a fight over money won in a card game.

*R.* 2:10–2. DiPaglia's gambling proclivity was part of the defense contention that he was a schizophrenic. Dr. Colley, a defense psychiatrist, characterized defendant as a compulsive gambler. With him "gambling was absolutely supreme. Nothing else mattered." The doctor testified that DiPaglia had told him that just prior to the robbery he had lost $20,000 in Las Vegas. On a prior occasion, defendant spent over 50 hours at the gambling tables without stopping.

In perspective, the prosecutor's improper statement suggesting that defendant had been barred from a golf club for gambling is not shown to have been prejudicial. At most, the prosecutor should be subject to censure for his conduct.

The prosecutor comes into court as the State's attorney. He is a constitutional officer representing the sovereign power of the people of the State by whose authority and in whose name, under the constitution, all prosecutions must be conducted. It is axiomatic therefore that in the performance of his duties he is subject to law. His presentation may be vigorous, even forceful, but it always must stay within the bounds of due process and fair play.

While we do not approve of some of the prosecutor's actions and remarks in the matter under review, it is clear that he was attempting to meet the defense contention that defendant's otherwise criminal conduct was but a manifestation of his insanity. The State had every right to urge upon the jury its position that defendant was legally sane.

One has to review the entire record to appreciate the flavor of the trial and how hard-fought it was on both sides. The trial court worked hard to keep the proceedings within proper bounds. Despite emotional presentations and some excesses by the defense as well as the prosecution, the issue was clear-cut and it has not been shown that the jury was misled, or defendant's right to a fair trial prejudiced.

The judgment of the Appellate Division is reversed and the judgment of conviction hereby reinstated.

CLIFFORD, J. (dissenting). While I am in agreement with so much of the opinion of the Court as deals with the burden of proof of the defense of insanity and with the undesirability of perpetuating the "presumption of sanity" charge, I cannot join in the conclusion that the prosecutor's remarks during trial and summation amount only to harmless excesses calling for no more than a mild expression of disapproval. Accordingly, I dissent.

The Appellate Division, in an unreported decision, held that the totality of the events here rendered the trial unfair and prejudiced the defendant's rights. I agree with that ruling because in my view the cumulative effect of the prosecutorial misconduct in this case was such as to deny the defendant his constitutional rights. The majority's toleration of that misconduct is neither appropriate to the excesses of the prosecutor in this case nor a deterrent to similar conduct by other prosecutors in future cases. See generally *State v. Thornton,* 38 *N. J.* 380, 400 (1962) *cert.* den. 374 *U. S.* 816, 83 S. Ct. 1710, 10 L. Ed. 2d 1039 (1963) and *State v. Farrell,* 61 *N. J.* 99, 104 (1972) for discussion of this Court's repeated efforts to curb prosecutorial excesses. In *Farrell* specific attention was drawn to a "number of instances recently brought to our attention that improper comments by prosecutors are becoming much too prevalent." The wistful expectation implicit in the reminder there furnished to prosecutors, "again, hopefully for the last time," that their primary duty is "not to convict, but to see that justice is done" has not been realized — at least not in this case. Thus we have a situation not unlike that adverted to by Judge Jerome Frank in his dissenting opinion in *United States v. Antonelli Fireworks Co.,* 155 *F.* 2d 631, 661 (2d Cir. 1946) :

This court has several times used vigorous language in denouncing government counsel for such conduct as that of the United States Attorney here. But, each time, it has said that, nevertheless, it would not reverse. Such an attitude of helpless piety is, I think, undesirable. It means actual condonation of counsel's alleged offense, coupled with verbal disapprobation. If we continue to do nothing practical to pre-

vent such conduct, we should cease to disapprove it. For otherwise it will be as if we declared in effect, "Government attorneys, without fear of reversal, may say just about what they please in addressing juries, for our rules on the subject are pretend-rules. If prosecutors win verdicts as a result of 'disapproved' remarks, we will not deprive them of their victories; we will merely go through the form of expressing displeasure. The deprecatory words we use in our opinions on such occasions are purely ceremonial." Government counsel, employing such tactics, are the kind who, eager to win victories, will gladly pay the small price of a ritualistic verbal spanking. The practice of this court — recalling the bitter tear shed by the Walrus as he ate the oysters — breeds a deplorably cynical attitude towards the judiciary.

There follow here some of the particularly offensive examples of infractions occurring during summation. The prosecutor said:

Stripping away the camouflage, this is something that we must do and we must adjudicate. And yet I am sure it gives none of us any great pleasure. When this case started, of course, we never knew what the defense might throw up to us. You see, we present the fact situation, we present the truth to you and all the facts that we can muster. It is not for them to present the truth to you; it is rather for them to obstruct us in our presentation, or to show that there is something wrong with what we say.

MR. ISAAC: Pardon me.

THE COURT: I think it's a poor choice of words, "to obstruct." It's for the defense counsel to put the State to its test.

MR. ——— [PROSECUTOR]: So you never know where they will try to throw up some kind of a defense."

The only legitimate inference from these statements is a strong one that the defense was fabricated. Note, in passing, that the infraction was so glaring that no sooner did defense counsel begin to object than the trial court alertly and decisively undertook to instruct the prosecutor, who, undaunted, plunged ahead in obvious disregard of the court's admonition.

Not only was the fabrication charge improper, it was contrary to the evidence. The defense presented expert witnesses who testified that the defendant was in fact insane, and lay witnesses from whose testimony could be drawn the legitimate conclusion that defendant's mental and physical

condition had been one of progressive deterioration. While the jury was not convinced, the argument was a respectable one, and defendant's sanity was a sharply contested issue at trial. The implication that the defense was fabricated was simply unsupported by any view of the record. And one of the most serious charges that can be made against a lawyer is that he fabricated a defense. Annotation, "Attack on opposing counsel — effect," 99 *A. L. R.* 2d 508, 577 (1965).

Likewise, the prosecutor's observation that the defense's role was to obstruct his presentation of "the truth" was prejudicially erroneous; obstruction of justice is a common law crime punishable as a misdemeanor under the statute, N. J. S. A. 2A:85–1; *State v. Cassatly,* 93 *N. J. Super.* 111 (App. Div. 1966), certif. den. 48 *N. J.* 448 (1967).

The jury was also told that defense counsel had hardly tried the case on the merits and had tried to "pull the wool over your eyes." Coupled with the fabrication and obstruction charges this clearly amounts to an attack upon opposing counsel. Defendant's motion for mistrial based on the abuses above, denied by the trial judge, was sufficient objection under the circumstances. See generally, *State v. Farrell, supra,* 61 *N. J.* at 106.

Later in summation the prosecutor characterized the defendant as a "leg breaker." Dr. David Driscoll, a defense psychologist, testified that DiPaglia had revealed to him that while in the service he had had a fight with a man who had stolen his gambling winnings and had broken the man's leg. That event, which took place many years prior to the trial, was certainly not a substantive issue in the case. The Appellate Division properly found this sweeping calumnious expression, "leg breaker," reminiscent of the "butcher boy" label criticized in *State v. Siciliano,* 21 *N. J.* 249, 262 (1956).

Subsequently, there came the following flourish:

This case stands not only for the question of People of the State of New Jersey against Floren DiPaglia. This case, I think stands

for a very elemental question of justice, and that is, can a man, can a man who claims that he is too wealthy get away with robbery, with armed robbery, theft —

A defense objection was overruled and the prosecutor continued:

This case stands not only for the question of the State versus this defendant, but it stands for a loftier principle, it stands for the issue that the defense raises of whether or not a man can be so rich that he is insulated, he is immunized by a claim of insanity from criminal conviction.

Ladies and gentlemen of the jury, if he gets away with this defense, justice has been mocked.

The Appellate Division correctly ruled that this was an attempt to broaden the issue for which the defendant was on trial beyond those for which he was indicted. See ABA Project on Minimum Standards for Criminal Justice, Standards Relating to the Prosecution Function § 5.8(d) (Approved Draft, 1971) [hereinafter cited as ABA Prosecution Function Standards]; Code of Professional Responsibility DR7–106 (C) (1).

The final sortie in the prosecutor's summation was "He is a criminal. We know it. Let's do our duty." The reference to the defendant as a "criminal" was, I suggest, so improper as not to need any further comment. The statement also expresses the personal opinion of the prosecutor on the merits of the case, and this for the second time. In the very beginning of the summation there appears the following:

You know that the defendant is guilty and I do, and we know that the only kind of craziness is crazy like a fox. And we know that he knows he is not crazy and is balancing, even as he tells the psychiatrist, the question of whether or not to plead guilty or plead craziness.

See *State v. Farrell, supra,* 61 *N. J.* at 103; ABA Prosecution Function Standards § 5.8(b). The trial judge instructed the jury properly on the first of these infractions

when defense counsel called it to his attention; neither counsel nor the court commented on the second.

In addition to these examples culled from the prosecutor's summation there were other instances of misconduct unjustified in the course of even a hard-fought trial. Illustrative of these are two situations, the first of which arose during the cross-examination of defendant's brother on the subject of defendant's having ever been barred from a golf club for gambling:

Q. I asked you about his being barred.
A. I am not aware of it. Let's put it that way.
MR. ISAAC: May I inquire through the Court and counsel whether these innuendoes and inferences are going to be proved by counsel.
THE COURT: Yes, sir.
MR. ——— [PROSECUTOR]: Your Honor, I can make a statement in front of the jury, if the Court wants.
MR. ISAAC: I am asking for proof.
THE COURT: Well, do you have such proof, yes or no?
MR. ——— [PROSECUTOR]: Your Honor, I spoke to the pro at the club yesterday.
MR. ISAAC: Pardon me. That's hearsay.
THE COURT: Well, yes. Can you bring him here?
MR. ——— [PROSECUTOR]: He cannot be subpoenaed.
THE COURT: Well, then you do not have the proof, and you should not ask questions that the State cannot back up. Innuendoes would be unfair.
I will sustain the objection.
The jury will disregard the answer, the question and the answer.

The second situation occurred during the cross-examination of Charles Cardoman, an Iowa attorney who acted as lawyer for the defendant's business organizations. This inquiry too revolved around defendant's gambling activities and particularly his gambling with his sister Olga:

Q. He also shoots dice at the golf club, aren't you aware of that, sir?
A. No, I am not aware of that.
Q. Do you know his sister?
A. I do.
Q. What's her name?

A. Olga.

Q. Do you know if she also shoots dice with him?

A. I don't know that. I know that Olga likes to play cards, but I don't know if Olga ever participated in any other game, Mr. ——— [Prosecutor].

Q. She also gambles?

A. I don't know. She plays regularly with some gals. Maybe a night a week or so, and what they play or how they play I have no personal knowledge of that. It's all hearsay.

Q. Did he ever tell you about a time that he and his sister were in a dice game in Omaha where he won over a thousand and she also won quite a bit?

A. I know of no such thing and don't know that to be true at all.

MR. ISAAC: Is counsel prepared to prove these things, or is he just making these things up?

MR. ——— [PROSECUTOR]: I am prepared to prove it.

THE COURT: All right.

MR. ——— [PROSECUTOR]: If your Honor please, I am prepared to make an offer of proof at this moment.

THE COURT: That won't be necessary. I will accept your representation.

In the first instance above the trial court resorted to the customary remedy of instructing the jury to ignore that which they had just heard — perhaps the only measure available short of a mistrial, but hardly an effective one in light of the potential damage caused by the prosecutor's inexcusable reference to his telephone conversation with an unavailable witness. In the second situation referred to the trial judge relied upon the prosecutor's representation, by clear implication if not express, that he would prove the gambling activities of defendant with his sister. That reliance was ill-placed, as it eventuated, for evidence to support the truth of the facts upon which the witness had been examined was never forthcoming.*

---

*I would add parenthetically that it is not clear to me how the prosecutor proposed to go about introducing the necessary proof, i. e., whether he was representing to the court that he was prepared to prove Cardoman was in fact aware of defendant's gambling with his sister, or, more likely, that he intended to prove the substance of such gambling quite apart from any knowledge Cardoman might have of it. If the latter, the trial court might well have ruled such evi-

Such improper behavior, as illustrated by the above, should not be countenanced by this Court. See *People v. Di Paolo,* 366 *Mich.* 394, 115 *N. W.* 2d 78 (Sup. Ct. 1962) ; *State v. Flowers,* 262 *Minn.* 164, 114 *N. W.* 2d 78 (Sup. Ct. 1962) ; ABA Prosecution Function Standards § 5.7(d) ; *Code of Professional Responsibility* DR7–106 (C) (1). See generally *State v. Orecchio,* 16 *N. J.* 125, 141 (1954) ; 6 *Wigmore, Evidence* § 1808 (2) (3 ed. 1940). Particularly should it not be condoned in this case, inasmuch as the State's brief informs us that this trial was a bitterly-fought contest between "two outstanding trial attorneys." All the more reason exists, then, for adherence by counsel to certain recognized standards of trial conduct and for the observance of fundamental fairness on the part of the prosecutor, who is, as the majority opinion observes, "a constitutional officer representing the sovereign power of the people * * *."

The prosecutor in a criminal case occupies a rather distinctive role in our system of justice. He is both an administrator of justice and an advocate. His duty is to seek justice, not merely to convict the accused. ABA Prosecution Function Standards § 1 (b), (c) at 43. His special responsibilities are as set forth by Mr. Justice Sutherland in *Berger v. United States,* 295 *U. S.* 78, 88, 55 S. Ct. 629, 633, 79 L. Ed. 1314 (1935) :

The * * * [prosecuting] Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all ; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with earnestness and vigor — indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.

dence inadmissible and not proper rebuttal in the present state of the record and in light of the defendant's not taking the stand to testify himself.

It is fair to say that the average jury, in a greater or less degree, has confidence that these obligations, which so plainly rest upon the prosecuting attorney, will be faithfully observed. Consequently, improper suggestions, insinuations, and, especially, assertions of personal knowledge are apt to carry much weight against the accused when they should properly carry none.

This classic statement has been resorted to by this Court in *State v. Bogen,* 13 *N. J.* 137, 139–140 (1953) (Brennan, J.), cert. den. *Lieberman v. New Jersey,* 346 *U. S.* 825, 74 S. Ct. 44, 98 L. Ed. 350 (1953); *State v. D'Ippolito,* 19 *N. J.* 540, 549–50 (1955) (Vanderbilt, C. J.); *State v. Farrell, supra,* 61 *N. J.* at 104, 105 (Proctor, J.).

Criminal trials are emotionally charged proceedings. A prosecutor is not expected to conduct himself in a manner appropriate to a lecture hall. He is entitled to be forceful and graphic in his summation to the jury, so long as he confines himself to fair comments on the evidence presented. *State v. Johnson,* 31 *N. J.* 489, 510–511 (1960), cert. den. 368 *U. S.* 933, 82 S. Ct. 370, 7 L. Ed. 2d 195 (1961); *State v. Mayberry,* 52 *N. J.* 413, 437 (1968), cert. den. 393 *U. S.* 1043, 89 S. Ct. 673, 21 L. Ed. 2d 593 (1969); *State v. Wilson,* 57 *N. J.* 39, 50 (1970).

Nevertheless, the accused has a constitutional right to a fair trial. *U. S. Const.,* amend. VI; *N. J. Const.,* Art. 1, ¶ 10. Where the conduct of the prosecutor is so prejudicial to the accused as to deny him a fair trial, this Court formerly undertook to reverse and remand for a new trial. See, *State v. D'Ippolito, supra; State v. Landeros,* 20 *N. J.* 69 (1955), cert. den. 351 *U. S.* 966, 76 S. Ct. 1025, 100 L. Ed. 1486 (1956); *State v. Siciliano, supra; State v. West,* 29 *N. J.* 327 (1959); *State v. Welsch,* 29 *N. J.* 152 (1959); *State v. Farrell, supra.*

The majority opinion disapproves of the prosecutorial excesses in this case but appears to excuse them on the ground that they were made in response to the defendant's theory of the case and his trial tactics. The proper avenue of relief in case of improprieties of defense counsel (which I do not

perceive from my own reading of the entire trial record) is to object and seek a ruling from the trial judge, not to indulge in retaliation. *State v. Welsch, supra,* 29 *N. J.* at 158; *Dugan Drug Stores, Inc. v. United States,* 326 *F.* 2d 835, 837 (5th Cir. 1964). See Singer, "Forensic Misconduct by Federal Prosecutors — And How it Grew," 20 *Ala. L. Rev.* 227, 246 (1968).

In *State v. West, supra,* 29 *N. J.* at 338, Chief Justice Weintraub stated the correct rule on prosecutorial retaliation:

> We have repeatedly stressed the obligation of a prosecutor to seek a fair trial [citations omitted.] He is not an ordinary adversary; he represents the State whose interest is served by an untainted judgment firmly rooted in facts alone. There is no room for unfair advantage clever or bald. He may parry impropriety by the defense and seek the ruling of the trial court to eradicate it, but he may not retaliate with improprieties of his own.

While the trial judge in these lengthy proceedings ruled firmly and did not permit the trial to get out of hand, it is my view that the circumstances created by the tactics of the prosecutor did not lend themselves to remedial instruction, where given, sufficient to avoid the potential for harm. While I would not go so far as to adopt, in this context, Mr. Justice Jackson's statement in his concurring opinion in *Krulewitch v. United States,* 336 *U. S.* 440, 453, 69 S. Ct. 716, 723, 93 L. Ed. 790 (1949), that "[t]he naive assumption that prejudicial effects can be overcome by instructions to the jury [citations omitted] all practicing lawyers know to be unmitigated fiction", I am nevertheless satisfied that the cumulative effect of those deplorable tactics was such that "[t]he impact was too great, the imprint too deep, the influence too persuasive, to be erased by the court's directive, no matter how explicitly given." *State v. Caccavale,* 58 *N. J. Super.* 560, 574 (App. Div. 1959).

The first trial in this case resulted in a hung jury. The weaker the State's case is against the defendant, the more — not the less — it is the prosecutor's obligation to stay within

proper bounds in order that no man be convicted unjustly, *State v. Bogen, supra,* 13 *N. J.* at 141. I believe those bounds to have been crossed here. Accordingly, I would affirm the Appellate Division's reversal of the judgment of conviction and remand for a new trial.

MOUNTAIN and PASHMAN, JJ., join in this dissent.

*For reversal*—Chief Justice HUGHES and Justices JACOBS, HALL and SULLIVAN—4.

*For affirmance*—Justices MOUNTAIN, PASHMAN and CLIFFORD—3.