**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4030-14T4

STATE OF NEW JERSEY,

      Plaintiff-Respondent,

v.

AL-SHAREEF METZ,

      Defendant-Appellant.

_____

      Argued October 24, 2017 — Decided November 16, 2017

      Before Judges Carroll, Leone and Mawla.

      On appeal from Superior Court of New Jersey, Law Division, Essex County, Indictment Nos. 12-06-1491 and 12-06-1492.

      Kelly Anderson Smith argued the cause for appellant.

      Kayla Elizabeth Rowe, Special Deputy Attorney General/Acting Assistant Prosecutor, argued the cause for respondent (Robert D. Laurino, Acting Essex County Prosecutor, attorney; Ms. Rowe, on the brief).

PER CURIAM

      Tried to a jury, defendant Al-Shareef Metz was convicted of murder and related weapons offenses in connection with the 2011

shooting death of Tariq Walker. The only evidence connecting defendant to the homicide were out-of-court identifications and statements by two witnesses who told police defendant was the shooter but recanted at trial. Defendant was sentenced to an aggregate sixty-five year prison term with an eighty-five percent period of parole ineligibility pursuant to the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2. He challenges his convictions by raising the following points:

POINT I

[] DEFENDANT WAS IRREPARABLY PREJUDICED WHEN THE TRIAL COURT ADMITTED HIGHLY SUGGESTIVE PHOTO IDENTIFICATION OF THE DEFENDANT BY STATE'S WITNESS, [T.J.],[1] WITHOUT FIRST CONDUCTING A WADE/HENDERSON HEARING.

POINT II

THE TRIAL COURT IMPROPERLY ADMITTED THE OUT-OF-COURT STATEMENT OF [K.L.].

POINT III

THE PROSECUTOR RELIED UPON IMPROPER AND PREJUDICIAL REMARKS IN HIS CLOSING STATEMENT WHICH INFLAMMED [sic] THE JURY AND DEPRIVED [] DEFENDANT [OF] A FAIR AND IMPARTIAL EVALUATION OF THE EVIDENCE IN THE CASE.

POINT IV

THE TRIAL COURT FAILED TO GIVE A PROPER AND COMPLETE JURY INSTRUCTION REGARDING PHOTO ARRAY IDENTIFICATION.

---

[1] We use initials to protect the privacy of the witnesses.

POINT V

THE TRIAL COURT FAILED TO PROPERLY RESPOND TO THE JURY'S REQUEST FOR A LIST OF EVIDENCE.

POINT VI

DEFENDANT WAS DENIED A FAIR TRIAL WHEN THE TRIAL COURT FAILED TO MAKE A COMPLETE RECORD [OF] CRITICAL READ-BACK TESTIMONY OF A MATERIAL WITNESS.

POINT VII

[THE] CUMULATIVE IMPACT OF THE ERRORS COMMITTED THROUGHOUT THE TRIAL DENIED DEFENDANT A FAIR AND IMPARTIAL PROCEEDING.

We have considered these arguments in light of the record and applicable legal standards. For the reasons that follow, we conclude the trial court erroneously failed to conduct an evidentiary hearing on one of the witness identifications; its read back of witness testimony was incomplete and misleading; and the prosecutor's summation was improper. Because the cumulative impact of these errors was capable of producing an unjust result, we reverse the convictions and remand for a new trial.

I.

On March 24, 2014, before starting jury selection, the court asked whether any motions in limine were pending. The State advised it had filed an in limine motion in April 2013, and represented, "I'm sure Your Honor will recall[] we discussed it at some length previously." The State explained its witness,

3                                                      A-4030-14T4

T.J., had originally selected photograph number two from a photo array, which was not defendant, and later that evening changed her mind and selected photo number five, which was defendant. The State noted both the first and second identifications were video recorded, but the first one "was lost, somehow misplaced." The State's motion was to admit the second identification, notwithstanding the loss or destruction of the recorded first identification.

Defense counsel then advised the court, "The only question is . . . whether or not you have to hear testimony. Our argument is that you, obviously, have to take testimony[,] [u]nder Rule 3:11[.]" When the court pointed out T.J. might be able to clarify how she recognized defendant, defense counsel noted, "that's why the question . . . of whether or not she has to be heard or there has to be a hearing." He suggested both out-of-court identifications should be admitted if the court were to find T.J. could identify defendant at trial without being tainted by the photo arrays. To clarify, defense counsel added, "[I]f she's testifying that she knows him, then that potentially eliminates the taint. But if she's testifying that she doesn't know him, then it's clear that her identification of him was based on the taint." Counsel then requested a hearing to resolve the issue.

4

The court inquired whether defense counsel had filed a <u>Wade</u>[2] motion. Counsel responded he did not do so because the State filed the motion in limine and requested a hearing. Counsel further stated that he, the court, and the prosecutor discussed this at a prior proceeding and determined there was no need to file the <u>Wade</u> motion.

The State then produced a transcript of the recording from T.J.'s second identification, where T.J. selected defendant's photograph, number five, from the photo array. After the State read excerpts from the transcript into the record, it argued T.J. said number five "of her own volition" and "not at the suggestion of the detective." Defense counsel asserted no evidence supported the State's position that T.J. decided on her own to return to the police and say "I misidentified," and the detective's leading questions constituted the only evidence that T.J. was hesitant to testify because she was afraid of retaliation from people "on the street." Defense counsel further noted that not only was the recording of the first identification lost, but the State produced no notes or written summaries of what occurred during that first identification. Thus, the only record of what transpired was the

---

[2] <u>United States v. Wade</u>, 388 <u>U.S.</u> 218, 87 <u>S. Ct.</u> 1926, 18 <u>L. Ed.</u> 2d 1149 (1967).

description an investigating officer, Detective Kelly, provided during his discussion with T.J. on the recording of the second identification. The State conceded Kelly was not a disinterested and detached officer, and he purportedly conducted the second identification because no such officers were available at the courthouse around midnight, when the second statement was taken.

Defense counsel sought to suppress T.J.'s testimony pursuant to Rule 3:11(d).[3] The court labeled that "a strong remedy" and told defense counsel, "Give me some case law and I will use my sound discretion." Defense counsel agreed to do so. The record on appeal does not reflect whether the parties submitted briefs, whether another hearing was held, or whether the court entered any orders connected with the State's in limine motion or defendant's

---

[3] Rule 3:11(d) provides:

> If the record that is prepared is lacking in important details as to what occurred at the out-of-court identification procedure, and if it was feasible to obtain and preserve those details, the court may, in its sound discretion and consistent with appropriate case law, declare the identification inadmissible, redact portions of the identification testimony, and/or fashion an appropriate jury charge to be used in evaluating the reliability of the identification.

Notably, the rule became effective in September 2012, following the photo identifications in this case.

competing request to suppress T.J.'s identification testimony. Ultimately, however, T.J. testified at trial regarding both identifications.

T.J. testified that on the evening of June 29, 2011, she was with the victim, Walker, and another individual, "Wilfee," near the intersection of Shephard and Huntington Avenues in Newark. At that time, "a Cherokee truck pulled up . . . and someone jumped out the passenger [side] and ran [Walker] down with like a shotgun." She and Walker ran in different directions, and the shooter ran after Walker. T.J. heard "a lot" of shots, following which she walked over to Walker and observed he had been shot.

T.J. testified the shooter was wearing a white t-shirt and jeans. She stated she got a good look at the shooter that night and would be able to identify him again, but when asked whether she saw that person in the courtroom, T.J. testified she did not. Defendant was present in the courtroom at the time.

T.J. recounted the circumstances surrounding her prior out-of-court identifications. Two days after the murder, she was driving in Newark when detectives pulled her over. The detectives told her they had video footage of her with Walker when he was shot, and she had to accompany them to the Essex County Prosecutor's Office.

T.J. was placed in a room with "speakers and cameras," where she told Kelly and a second detective what she observed on June 29, 2011. The detectives then left the room, and a female detective, Detective Oliveria, entered alone and showed T.J. a photo array. T.J. selected photograph number two as the shooter and communicated that to Oliveria. T.J. testified she was confident about her selection. At 10:18 p.m., Oliveria had T.J. sign her name on photograph number two.

T.J. testified, "then all these different guys coming in saying all this, scaring us." Referring to the detectives, she explained:

> I didn't tell him nothing but then I was in for hours, I was just ready to get out, I am hostage and they was like threatening me, telling me about that they could pull up records of tickets, you go to jail, basically scaring me up.

When she asked to leave, Kelly said, "not now."

Referring to Kelly, T.J. stated, "He asked me am I sure that I picked the right photograph. I said that's what I saw, so--." Kelly then pointed to photograph number five and asked, "Do you think this is the person?"

T.J. testified, "By then I am just like scared, . . . [t]hey had me in for six to seven hours[,]" and by that point she was "ready to go." Kelly instructed her to cross out her signature

on photograph two and put her initials there, and T.J. complied. At one minute after midnight, T.J. initialed photograph number five and wrote "the person that shot [Walker], he had a white tee shirt." In response to leading questions from the prosecutor, T.J. stated she chose photograph number five of her own volition.

On redirect examination by the prosecutor, the following exchange occurred:

Q: You have never met with me.

A: No, just spoke to you on the phone.

Q: Is that because you didn't want to come down here?

A: Yes.

Q: You didn't want to testify today?

A: Yes.

Q: You didn't want to come meet with me prior to the testimony?

A: Right, I didn't want to come to this building.

Q: Why?

A: Because how I was treated in 2011.

Q: Had you ever indicated that you had fear about testifying?

A: Yeah.

Q: You had fear about going back to the neighborhood?

A: Well, I also go through the neighborhood, I got family in Newark so I am always passing through the neighborhood.

Q: Even to this day?

A: I don't feel like I have to jeopardize, can't come to Newark because, you know --

Immediately after that exchange, T.J.'s testimony concluded with the following re-cross examination by defense counsel, which was later omitted from a read back of her testimony to the jury:

Q: That night, that is the night of July 31st, into August 1st, <u>the police put you in fear, true?</u>

A: <u>Yes.</u>

Q: That night of July 31st to August 1st they threatened to lock you up about tickets, true?

A: Yes.

Q: Were you afraid?

A: I think I had two parking tickets that I hadn't paid yet by then, I think it was the [second detective] saying like <u>he could lock me up, scaring me up.</u>

[(Emphasis added).]

A second witness called by the State, K.L., testified he was inside a building near the intersection of Shephard and Huntington Avenues in Newark on July 29, 2011. He stated he did not observe the shooting, did not know the victim personally, and was unable to identify the shooter in the courtroom. The State requested a

sidebar, advised the court that K.L. had directly contradicted two prior sworn statements, and requested a hearing pursuant to State v. Gross, 121 N.J. 1 (1990). Defense counsel joined the request, and the court excused the jury and conducted the hearing.

At the Gross hearing, K.L. testified he was arrested on August 29, 2011, on drug-related charges. He was then brought to Detective Philip Gregory, who asked whether he knew someone involved in Walker's shooting. K.L. initially responded he did not, but ultimately he gave a statement because Gregory said he would release him, and K.L. felt coerced. K.L. acknowledged his statement was recorded, but asserted Gregory told him what to say. He further testified Gregory showed him a photo array and told him to select defendant's photo. Detective Muhammed, who K.L. had never met before, then came into the room to show him the same photo array, but he "didn't pick anything."

K.L. testified that, on a later date, Gregory "called me and told me I had to come in. So, I come in. He bring me in the room with people like this sitting, I don't know what I was there for." He added, "I thought it was a court date and . . . [w]hen I got down there, Detective Gregory was there. He was just telling me: 'Look, you about to go in there, tell them such-and-such, such.'" At nineteen years old, K.L. did not realize he was about to testify at defendant's grand jury hearing.

11

K.L. asserted he did not remember any details about the shooting, what he told the detectives, or his grand jury testimony. He explained that, before the grand jury, "I repeated everything [Gregory] told me to repeat when it happened that day." He stated he was drinking when the shooting occurred, "so I really don't remember half of the stuff that was going on that day." He added he had been shot on a previous unrelated occasion before Walker's death, "so I was on a whole lot of morphine. I was in the hospital for like a month-and-a-half, so I really don't remember a whole lot of stuff."

Following K.L.'s testimony at the <u>Gross</u> hearing, the State called Gregory, who gave a different version of events. According to Gregory, K.L. indicated he observed "what happened regarding [the] shooting." Gregory explained he prepared a photo array and then Muhammed, who had no other involvement in the case, administered it to K.L. Gregory did not advise Muhammed which photo depicted defendant, nor promise to let K.L. go if he gave a statement.

After the testimony at the <u>Gross</u> hearing concluded, the judge reviewed the video of K.L.'s recorded interview. In a detailed oral opinion, the judge concluded the State established the reliability of K.L.'s prior statements by a preponderance of the evidence. K.L.'s video-recorded statement to Gregory and Muhammed

and an audio recording of his grand jury testimony were admitted in evidence and played for the jury.

K.L. then resumed his trial testimony. He stated he visited Muhammed Bashir, defendant's trial attorney, at Bashir's office three or four weeks before trial. Bashir made an audio recording of the conversation and gave a copy to the State, although it was not admitted in evidence.

When asked his purpose in visiting Bashir, K.L. testified, "Because I wanted to let him know that this whole thing was a lie." The prosecutor then asked: "Is it true your primary motivation for going to see Mr. Bashir is you were afraid your name would get out on [the] streets as a tattletale or snitch?" K.L. responded, "Yes," but when asked the clarifying question, "That's your primary motivation in going to see him?" he responded, "No."

The following exchange occurred during the State's redirect examination of K.L. regarding his audio-recorded conversation with Bashir:

> Q: You recall "I assume you are here because you are afraid of what could happen on the streets if your name came out [as] part of this particular case"?
>
> A: <u>No.</u>
>
> Q: You don't recall that?

A: No.

. . . .

Q: Do you remember indicating ["]at the end of the day, I just don't want to get that name -- I got a mother, I got a daughter, I -- like I just got a lot of people. You feel me? I can't have nobody--it's just a lot of it, just everything that you could think about from being a tattletale . . . . That's my own words.["] Do you recall giving that?

A: Yeah, <u>I didn't say it like that</u>, how you just said it.

Q: You got to think about more than one person right now. Is that correct?

A: Yes.

Q: While you were changing your story, do you recall — ["]I am changing my story from the first story, that's because I want to protect my whole family, to protect everybody.["]

A: <u>No.</u>

. . . .

Q: You indicated that you had ["]great concern about becoming a tattletale.["] Describe to me what that means. What is a tattletale?

A: Tattletale is when you tell on someone.

Q: What are the repercussions you're concerned about?

A: I am not.

. . . .

Q: The reason for indicating that was your primary motivation when asked by — you came

to Mr. Bashir's office concerned about being a tattletale.

A: I wasn't concerned about --

Q: You weren't concerned about you, you were concerned about being a tattletale[?]

A: <u>No.</u>

Q: It's not difficult to come in here and testify in front of all this open courtroom?

A: I am telling you the truth.  That's what I want, to tell truth.

Q: You're not concerned about leaving here today and going back to the neighborhood?

A: No.

Q: [] No?

A: <u>I am not concerned.</u>

[(Emphasis added).]

Early in his summation, the prosecutor used the following metaphor:

> I want to talk to you about the concept of a cocoon.  It's not [going to] be a story about how somebody goes into the cocoon at one time and comes out a butterfly.  It's more about the idea of being wrapped and feeling safe, like when a newborn comes into the world, you're taught to swaddle them.  First thing they want to have done to them is they want that blanket put around them, they want it wrapped tight, and they want to feel safe.
>
> Your . . . out-of-court identifications in this case happen in a cocoon.  Before that -- before they're there, they're frightened.

The prosecutor then stated, "[K.L.] told you over and over and over that he was scared. And he didn't just say it now, he said it over and over and over in the past."

The prosecutor then referenced the portion of K.L.'s cross-examination relating to K.L.'s meeting with Bashir a few weeks before trial. The prosecutor recited Bashir's question asking K.L. if he met with Bashir because he was "afraid of what could happen to [him] on the streets if [his] name came out as part of this particular case." As the prosecutor was about to recite K.L.'s answer from the recording, defense counsel objected and the court conducted a sidebar conference.

The prosecutor explained he intended to read to the jury from the transcript made of the recording of that meeting. The court responded, "I understand you asked the questions but you can't read from something that's not in evidence." (Emphasis added). The court ultimately overruled the objection, determining the State was not seeking to introduce K.L.'s answers to Bashir for the truth of the matter asserted, but rather for the limited purpose of showing K.L.'s inconsistency. The court did not, however, instruct the jury that K.L.'s statement could be considered only for that limited purpose.

After resuming his summation, and despite the court's ruling, the prosecutor continued,

> *I indicate to you that the inconsistency is the truth.* His number [one] priority in this world at this time was to clear his name and to think about his daughter, and all those types of things that he indicated to you. He doesn't want to be a tattle tail [sic] on the street. He is afraid. That's his primary motivation. Otherwise, *the first answers to those things would have been totally different.*"

[(Emphasis added).]

At the jury charge conference, defense counsel requested the court include the subsection of the model jury charge on out-of-court identifications labeled "Multiple Viewings,"[4] arguing it applied because T.J. had been shown photograph number five "three or four times." The court rejected defendant's request, concluding the charge was inapplicable to his theory of the case.

During jury deliberations, the court received jury note C-3, which contained the following two questions: (1) "Can we have a copy of a list of all evidence[?]" and (2) "was crime scene report [sic] entered into evidence and can we have a copy[?]" After conferring with the prosecutor and defense counsel, and securing their consent, the court advised the jury that it could not create an evidence list for them but they were free to compile their own.

---

[4] See Model Jury Charge (Criminal), "Identification: Out-Of-Court Identification Only" at 5, 6 (2012).

The court further informed the jury, "you can have testimony read back as well, if you like."

The court also received jury note C-6, which read, "We would like to see -- or in parenthesis -- or be re-read -- or read the entire testimony of [T.J.], both direct and cross." (Emphasis added). The court responded, "In fact, when you ask for testimony of a witness, you get direct, cross, redirect, re-cross, and [] all testimony . . . ." (Emphasis added). The court reporter then "read back" T.J.'s testimony.

Defense counsel requested a sidebar and advised the court, "The last question I asked her on [] re-cross was: Are you more afraid . . . of the streets? Or are you more afraid of the police?" The prosecutor responded, "I actually do remember that. I do remember that. I do." The court agreed to look into the matter and told the jury, "In listening to the testimony, there may have been one or two questions or answers that may not have been recorded. . . . I'm going to ask you to continue your deliberations. However, we're going to double check, to make sure that we had the complete testimony."

An hour and forty-five minutes later, the court called the jury in and advised them, "In response to your question, I have reviewed the transcript and that is the entire testimony. So, you

18

can continue your deliberations.    Okay?    <u>That's the entire testimony under the official court record.</u>"    (Emphasis added).

The jury resumed deliberations and the court addressed the attorneys "for the record."    The court noted it reviewed the transcript and did not see the re-cross testimony, but it was "aware that there is a backup system working in Trenton at all times."    The court then explained,

> During lunch, I called Trenton to see -- I was always advised that you need a Court Order and I was always advised really then it had to be from the Assignment Judge, but I called Trenton to see the feasibility of assessing this record, this backup system, to see whether or not this question was even asked. I was called back and they told me again that I needed to have my Assignment Judge. . . .
>
> I also got a call from the Appellate Division while counsel was in my chambers, which said they heard I had a problem or something, and I talked to them.  I told them I pretty much resolved this in my mind because we're in the middle of a homicide deliberation from a trial.  I'm certainly not going to recess trial and try to get a Court Order to assess something that <u>the defense attorney -- and for the record, the Prosecution said they believe they heard it too and they were willing to stipulate to it</u> -- to recess this to confirm it.
>
> I am going to go with the official court record, and as anyone knows who tries cases the official court record is the record that's provided by the official court reporter.  And that's why I just advised the jury that under the official court record that's the entire testimony, and that's the position of this

A-4030-14T4

Court. <u>I don't know how I could do anything differently.</u> And certainly, I don't think it would be appropriate to recess this trial because there ha[s] been a question and an answer that <u>the attorneys believe was stated to this witness that wasn't included in the read back</u>.

[(Emphasis added).]

On April 23, 2014, the jury found defendant not guilty of conspiracy to commit murder (count one) and guilty of murder (count two), unlawful possession of a weapon (count three), and possession of a weapon for an unlawful purpose (count four). A trial was then conducted on a separate indictment charging defendant with certain persons not to possess weapons, on which the jury also returned a guilty verdict. On March 16, 2015, defendant was sentenced to an aggregate sixty-five year prison term, subject to NERA. This appeal followed.

II.

A.

We first address defendant's argument that the trial court erred by failing to hold a hearing on whether the police irreparably tainted T.J.'s identification of defendant by conducting the photo array procedure in an impermissibly suggestive manner. Defendant attacks the admissibility of T.J.'s identification, based on suggestiveness and reliability, as well

as the police failure to keep a record of T.J.'s first identification in which she identified someone else as the shooter.

The State responds that "[d]efendant invited the error he now challenges" because he "never requested a Wade hearing and, instead, simply challenged the State's motion in limine to admit [T.J.'s] out-of-court identifications." It further contends defendant "made a sound strategic decision . . . not to push the suppression issue and opted to have the full opportunity to cross-examine [T.J.]."

Historically, courts followed the United States Supreme Court's two-part test to determine the admissibility of an eyewitness's out-of-court photographic identification, set forth in Manson v. Brathwaite, 432 U.S. 98, 97 S. Ct. 2243, 53 L. Ed. 2d 140 (1977), which was adopted by the New Jersey Supreme Court in State v. Madison, 109 N.J. 223 (1988). In Manson, the United States Supreme Court expounded on the test initially identified in Simmons v. United States, 390 U.S. 377, 88 S. Ct. 967, 19 L. Ed. 2d 1247 (1968), which requires a court to determine whether the out-of-court photographic identification procedures used were impermissibly suggestive. Manson, supra, 432 U.S. at 114, 97 S. Ct. at 2253, 53 L. Ed. 2d at 154. If so, the court then must examine whether the objectionable procedure resulted in "a very

substantial likelihood of irreparable misidentification." Id. at 116, 97 S. Ct. at 2254, 53 L. Ed. 2d at 155.

When examining a challenge to the admissibility of identification testimony, a court must assess whether the impermissibly suggestive procedures used by law enforcement prejudicially affected the identification, by weighing five factors to "determine whether . . . sufficient indicia of reliability [would] 'outweigh the "corrupting effect of the suggestive identification itself."'" Madison, supra, 109 N.J. at 239 (quoting State v. Ford, 79 N.J. 136, 137 (1979) (quoting Manson, supra, 432 U.S. at 114, 97 S. Ct. at 2253, 53 L. Ed. 2d at 154)). These factors "include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation." Manson, supra, 432 U.S. at 114, 97 S. Ct. at 2253, 53 L. Ed. 2d at 154.

After Madison, the Court again considered eyewitness identification challenges in State v. Delgado, 188 N.J. 48 (2006). Noting "[m]isidentification is widely recognized as the single greatest cause of wrongful convictions in this country[,]" id. at 60, the Court chose to exercise its supervisory powers, granted

by Article VI, Section 2, Paragraph 3 of the New Jersey Constitution, "to require, as a condition to the admissibility of out-of-court identifications, that the police record, to the extent feasible, the dialogue between witnesses and police during an identification procedure." Id. at 51. The Court held the admissibility of out-of-court identifications was conditioned upon the preparation of:

> a written record detailing the out-of-court identification procedure, including the place where the procedure was conducted, the dialogue between the witness and the interlocutor, and the results. Preserving the words exchanged between the witness and the officer conducting the identification procedure may be as important as preserving either a picture of a live lineup or a photographic array. When feasible, a verbatim account of any exchange between the law enforcement officer and witness should be reduced to writing. When not feasible, a detailed summary of the identification should be prepared.
>
> [Id. at 63.]

By that time, "[t]he State's Attorney General . . . ha[d] recognized that eyewitness identification 'evidence is not fool-proof,' and made New Jersey the first state to adopt the United States Department of Justice's procedural recommendations to increase reliability in photo and live lineups." State v. Romero, 191 N.J. 59, 74 (2007) (citing Letter from Attorney General John J. Farmer, Jr., to All County Prosecutors et al., at 1 (Apr. 18,

A-4030-14T4

2001) (on file with the New Jersey Division of Criminal Justice)).

In that letter, the Attorney General instructed:

> When it is not possible in a given case to conduct a lineup or photo array with an independent investigator, the primary investigator must exercise extreme caution to avoid any inadvertent signaling to a witness of a "correct" response which may provide a witness with a false sense of confidence if they have made an erroneous identification. Studies have established that the confidence level that witnesses demonstrate regarding their identifications is the primary determinant of whether jurors accept identifications as accurate and reliable. Technological tools, such as computer programs that can run photo lineups and record witness identifications independent of the presence of an investigator, as well as departmental training of a broader range of agency personnel to conduct lineups and photo identifications may also assist agencies and departments with staff and budget constraints in implementing this recommendation.
>
> [Letter from John J. Farmer, Jr., Att'y Gen., to All Cty. Prosecutors, et al., at 2 (Apr. 18, 2001) (footnote omitted), http://www.njdcj.org/agguide/photoid.pdf.]

The Supreme Court revisited and comprehensively considered this thorny issue in State v. Henderson, 208 N.J. 208 (2011), which established a more detailed framework to examine the admissibility of out-of-court identification testimony, provide new guidelines to reduce the possibility of misidentification, offer a more adequate measure for reliability, and deter potential police misconduct. Id. at 288-99. However, the photo

identifications at issue in the present case were conducted before Henderson's new rule of law took effect and remain subject to the prior rubric of Manson/Madison.[5]

A trial court may need to conduct a pretrial Wade hearing pursuant to N.J.R.E. 104 to determine whether the out-of-court identification should be suppressed under the Manson/Madison framework. State v. Michaels, 136 N.J. 299, 320 (1994). In Michaels, the Supreme Court "recognized that when an identification is crucial to the prosecution of a criminal case, its reliability, and ultimate admissibility, must be strictly tested through a searching pretrial hearing." Id. at 319.

There is no automatic right to a Wade hearing, and there must first be a "threshold showing of suggestiveness" in a witness's out-of-court identification. State v. Ruffin, 371 N.J. Super. 371, 390-91 (App. Div. 2004). While a trial court only needs to address the issue of "taint" after finding the identification procedure used was "unduly suggestive," the Supreme Court advised trial courts "to hold a taint hearing and make specific findings of fact on the independent reliability of the identifications" when the identification process implemented was sufficiently "questionable." Madison, supra, 109 N.J. at 244-45. It further

---

[5] See id. at 220 (applying new test prospectively, from September 4, 2012).

noted "it is helpful to an appellate court if a trial court sets forth its specific findings on why it deems a photo array not impermissibly suggestive," and the failure of a trial court to make such specific findings "unduly complicates appellate review." Id. at 245 (second quotation quoting State v. Cooper, 165 N.J. Super. 57, 67 (App. Div. 1979)).

Here, the record does not support the State's contention that defendant invited any error by failing to request a Wade hearing. "The doctrine of invited error operates to bar a disappointed litigant from arguing on appeal that an adverse decision below was the product of error, when that party urged the lower court to adopt the proposition now alleged to be error." N.J. Div. of Youth & Family Servs. v. M.C. III, 201 N.J. 328, 340 (2010)).

It instead appears the State's in limine motion was discussed at an earlier proceeding, when it was indicated it was not necessary for defendant to formally file a Wade motion with respect to T.J.'s out-of-court identification that the State sought to admit. Rather than inviting any error, defendant opposed the State's motion, repeatedly requested a hearing, and argued that suppression of T.J.'s identification, rather than its admission, was the appropriate remedy.

In any event, the court erred by failing to conduct an evidentiary hearing on the State's in limine motion. At the time

26

the photo array was conducted, the State was required to preserve the dialogue between the witness and questioner and the results of that dialogue, by verbatim recording when feasible and, if not, by detailed summary. Delgado, supra, 188 N.J. at 63. The State failed to produce any record or summary of what occurred during the first identification when T.J. selected photograph number two and not the defendant's photograph. The State was unable to proffer any explanation why this recording was not preserved. Moreover, the State all but conceded the process employed by the police did not comport with the New Jersey Attorney General Guidelines concerning photo identification procedures because Detective Kelly, and not an independent investigator, participated in the second identification. All these facts call into question the validity of the identification procedure. Since T.J.'s identification of defendant was crucial to his prosecution, the court should have conducted an evidentiary hearing to determine the admissibility of that identification.

Critical also is the court's failure to rule on the State's in limine motion. At the very least, the court erred in not placing its findings on the record. During argument on the motion, the judge acknowledged T.J.'s first identification "raises some questions because it was recorded and it was lost. And so then the court would have to make a legal finding as to whether or not

that was done in bad faith." However, the judge failed to make any findings with regard to this or any other aspect of the motion.

Because we conclude this and other trial errors discussed below cumulatively warrant reversal of defendant's convictions, on remand we direct the trial court to conduct an evidentiary hearing. The court shall make specific findings regarding the absence of a record of T.J.'s first identification and whether the police procedures employed during T.J.'s identifications were impermissibly suggestive. Depending on those findings, the court shall then determine whether the absence of a record of the first identification, or any improper police procedures, created a "very substantial likelihood of irreparable misidentification." Madison, supra, 109 N.J. at 232.

### B.

Defendant argues he was deprived of a fair trial due to improper remarks made by the prosecutor during summation. He contends the "cocoon" analogy was inappropriate because it "creat[ed] a hostile environment for the [d]efendant." He also asserts the State mischaracterized K.L.'s testimony, and that his alleged fear was "not in evidence, but mere speculation by the State."

"Prosecutors are afforded considerable leeway in closing arguments as long as their comments are reasonably related to the

scope of the evidence presented." State v. Frost, 158 N.J. 76, 82 (1999). Prosecutors "are duty-bound to confine their comments to facts revealed during the trial and reasonable inferences to be drawn from that evidence." Id. at 85. "In determining whether prosecutorial misconduct is prejudicial and denied defendant a fair trial, [the courts] consider whether defense counsel made a timely and proper objection, whether the remark was withdrawn promptly, and whether the court ordered the remarks stricken from the record and instructed the jury to disregard them." State v. Ramseur, 106 N.J. 123, 322-23 (1987) (citing State v. Bogen, 13 N.J. 137, 141-42, cert. denied, 346 U.S. 825, 74 S. Ct. 44, 98 L. Ed. 350 (1953)).

Prompt and effective instructions have the ability to neutralize prejudice engendered by an inappropriate comment or piece of testimony. State v. Wakefield, 190 N.J. 397, 440 (2007), cert. denied, 552 U.S. 1146, 128 S. Ct. 1074, 169 L. Ed. 2d 817 (2008). Whether or not a curative instruction can eliminate the danger of such an error "focuses on the capacity of the offending evidence to lead to a verdict that could not otherwise be justly reached." State v. Winter, 96 N.J. 640, 647 (1984).

In the present case, a significant portion of the prosecutor's summation focused on K.L.'s alleged inconsistent statements. A prior inconsistent statement may be introduced to neutralize

testimony under N.J.R.E. 607, which, unlike N.J.R.E. 803(a)(1), does not require the court to determine the prior inconsistent statement is reliable. State v. Nelson, 318 N.J. Super. 242, 252 (App. Div.), certif. denied, 158 N.J. 687 (1999); State v. Benthall, 182 N.J. 373, 380 (2005) (emphasizing a prior inconsistent statement is only admissible under N.J.R.E. 607 after the trial court finds "the party seeking to neutralize had no prior knowledge that the witness would testify contrary to the prior statement").

"Neutralization evidence may only be used to 'eras[e] or cancel[]' surprising, harmful testimony.  It may not be used affirmatively, that is, for the truth of the matter being asserted. Its use lies in assisting the jury only 'in deciding whether to believe the testimony which the prior statement contradicts.'" Id. at 385 (citations omitted).  In such instances, the trial court must give the jury a limiting instruction that "strongly emphasize[s] that in no event is the jury to use the prior statement as proving the truth of the matter therein allegedly stated."  Id. at 379 (quoting State v. Gallicchio, 44 N.J. 540, 547 (1965)).

Here, arguably the prosecutor's cocoon remark was based on reasonable inferences drawn from the witnesses' pretrial statements and was not plain error.  We reach a different

conclusion, however, regarding the prosecutor's reference to K.L.'s recorded conversation with Bashir.

As with K.L.'s statement to the detectives, the State could have sought to admit K.L.'s recorded conversation with Bashir into evidence for the truth of the matter asserted under N.J.R.E. 803(a)(1)(A). Doing so would have required the State to establish the reliability of that out-of-court statement by a preponderance of the evidence at a hearing. Gross, supra, 121 N.J. at 15. However, the State decided not to pursue that course, and the conversation with Bashir was never admitted in evidence.

Moreover, the State did not attempt during K.L.'s testimony to "examine the witness and introduce extrinsic evidence . . . [to] neutralize the witness' testimony by a prior contradictory statement." N.J.R.E. 607. Instead, the prosecutor waited until closing argument to attempt to inform the jury of K.L.'s answers to Bashir. The court ruled that K.L.'s statement to Bashir could not be offered for the truth of the matter asserted, but only to show K.L.'s in-court and out-of-court statements were inconsistent. Nonetheless, the prosecutor argued in his summation that the jury should accept K.L.'s statement to Bashir as truthful. After highlighting K.L.'s prior inconsistent statement, the prosecutor asserted, "I indicate to you that the inconsistency is the truth." (Emphasis added).

Perhaps this error could have been mitigated by a forceful curative or limiting instruction. However, the court failed to instruct the jury on the limited purpose for which the testimony was admitted. Compounding the error, the court instructed the jury:

> Evidence has been presented showing that at a prior time, a witness has said something, or failed to say something which is inconsistent with the witness's testimony at trial. This evidence may be considered by you as substantive evidence, or proof of the truth of the prior contradictory statement or omitted statement.

> [(Emphasis added.)]

While this instruction properly applied to K.L.'s statements to the detectives and the grand jury, which were admitted into evidence following the Gross hearing pursuant to N.J.R.E. 803(a)(1)(A), the court never clarified to the jury that the same instruction did not apply to K.L.'s out-of-court statement to Bashir.

C.

Defendant argues the trial court erred by telling the jury it read back to them T.J.'s "entire" testimony, even though both the defense and the prosecution advised the court that a portion of re-cross examination had been omitted. Defendant contends the omitted testimony was critical because it contradicted the State's

theory that T.J. was intimidated by defendant and supported the defense position that her identification was coerced by law enforcement. Defendant argues, "The incomplete testimony made the defense appear to be lying, incompetent or trying to deceive the jury, as it was in direct contradiction to [d]efendant's closing argument."

"[T]he response to a jury's request for a readback of testimony or a replay of a video recording is vested in the discretion of the trial judge." State v. A.R., 213 N.J. 542, 555-56 (2013). That said, courts should grant such requests in the absence of "some unusual circumstance," and they "should not decline a request simply because it 'would take time.'" State v. Miller, 205 N.J. 109, 120 (2011) (quoting State v. Wolf, 44 N.J. 176, 185, 186 (1965)). When exercising that discretion, our Supreme Court has instructed that generally "the entire testimony requested should be played back — including direct and cross examination — so that evidence may be considered in its proper context. Only then can a jury hear both direct proofs as well as inconsistencies and impeachment material." Id. at 122 (citation omitted). These "requests are a clear sign that the evidence sought is important to the deliberative process" and "reflect the reality that jurors cannot be expected to have perfect recall of every bit of evidence introduced during a trial." Id. at 120.

33

Here, both the defense and the State agreed that testimony had been omitted from the read back, and they further agreed on the substance of that omission. The court was aware it could access the recorded testimony from the "backup system" with an order from the Assignment Judge,[6] and even acknowledged the State was willing "to recess this to confirm it." Moreover, the court recognized the parties "were willing to stipulate" to the omitted testimony. Under these circumstances, the trial court should have allowed the parties to enter into a formal stipulation as to what was omitted, or taken the additional time to procure the backup CourtSmart recording. Its failure to adopt either of these alternatives constituted an abuse of discretion.

The court again compounded the error by misadvising the jury, "That's the entire testimony under the official court record." To the extent, then, that any of the jurors properly recalled the

---

[6] The secondary recording made by CourtSmart can be accessed if the primary recording system fails to record any portion of a court proceeding, provided the Assignment Judge approves the access and signs off on a form that is publicly available on the Internet. See New Jersey Administrative Office of the Courts, Supplement to Directive # 07-10 (Jan. 3, 2011), https://www.judiciary.state.nj.us/attorneys/assets/directives/dir_07_10_supp1.pdf; New Jersey Administrative Office of the Courts, Directive # 07-10 (Aug. 3, 2010), https://www.judiciary.state.nj.us/attorneys/assets/directives/dir_07_10.pdf.

excluded testimony, they were effectively instructed to disregard it.

The omitted re-cross examination was significant. The jury expressly requested T.J.'s entire testimony be read back, but they did not receive it. On redirect, T.J. stated she did not want to testify and that she had fear about testifying. When asked whether she was afraid to go back to the neighborhood, she equivocally testified she has family there and is "always passing through." Detective Gregory later testified T.J. was afraid of retaliation for cooperating with the police. In the testimony omitted from the read back, T.J. clarified she was afraid of the police because they threatened to incarcerate her for parking tickets. If the jury did not consider the re-cross examination, based on the trial court's erroneous instruction, then it could not properly assess whether T.J. was afraid to testify because of a threat of violent retaliation from members of her neighborhood or the fear of police intimidation. In light of these circumstances, the court abused its discretion in a manner capable of undermining the jury's careful consideration of critical evidence.

### D.

While perhaps any of the errors we have identified above, standing alone, may be insufficient to warrant reversal, we agree with defendant's contention that the cumulative effect of the

errors constrains us to reverse his convictions and remand for a new trial. "[W]here any one of several errors assigned would not in itself be sufficient to warrant a reversal, yet if all of them taken together justify the conclusion that defendant was not accorded a fair trial, it becomes the duty of this court to reverse." State v. Weaver, 219 N.J. 131, 155 (2014) (quoting State v. Orecchio, 16 N.J. 125, 134 (1954)).

Summarizing these errors: (1) the court failed to conduct an evidentiary hearing and make required findings regarding the admissibility of T.J.'s identification testimony; (2) the prosecutor's summation improperly asked the jury to consider for its truth K.L.'s statement to Bashir that was not in evidence and could not be considered for its truth, and the court failed to issue a limiting or curative instruction but instead instructed that prior statements could be considered for their truth; and (3) the court misadvised the jury regarding significant re-cross examination of a key prosecution witness of T.J., notwithstanding the parties' willingness to stipulate to the excluded portion and their willingness to recess the trial so the omitted testimony could be retrieved.

Viewed in the aggregate, these errors are significant because the only evidence linking defendant to the murder came from the out-of-court statements of those two witnesses who recanted at

trial, testified their statements were the product of police coercion, and were unable to make in-court identifications. Because the cumulative impact of these errors was capable of producing an unjust result, we reverse the convictions and remand for a new trial.

E.

We conclude defendant's remaining arguments do not support reversal of his convictions and lack sufficient merit to warrant extended discussion. R. 2:11-3(e)(2). We add the following limited comments for the sake of completeness.

Defendant argues the trial court failed to properly consider and apply the Gross factors, resulting in the improper admission of K.L.'s statement to police. We disagree.

We review a trial court's evidentiary rulings only for abuse of discretion, and do not set such rulings aside unless it appears that "there has been a clear error of judgment." State v. J.A.C., 210 N.J. 281, 295 (2012). We must be convinced that "the trial court's ruling is so wide of the mark that a manifest denial of justice resulted." Ibid.

The admission of a prior inconsistent statement of a witness at trial is governed by N.J.R.E. 803(a)(1). State v. Johnson, 421 N.J. Super. 511, 516 (App. Div. 2011). A prior inconsistent statement is admissible as substantive evidence when offered by

37

the party who called the witness if it is "contained in a sound recording or in a writing made or signed by the witness in circumstances establishing its reliability." Ibid. In order to determine whether the circumstances provide sufficient indicia of reliability, a trial court holds a hearing outside of the presence of the jury to determine, by a fair preponderance of the evidence, whether the circumstances surrounding the prior statement indicate the statement's reliability. Id. at 517. In making that determination, the trial court must consider a number of factors:

> (1) the declarant's connection to and interest in the matter reported in the out-of-court statement, (2) the person or persons to whom the statement was given, (3) the place and occasion for giving the statement, (4) whether the declarant was then in custody or otherwise the target of investigation, (5) the physical and mental condition of the declarant at the time, (6) the presence or absence of other persons, (7) whether the declarant incriminated himself or sought to exculpate himself by his statement, (8) the extent to which the writing is in the declarant's hand, (9) the presence or absence, and the nature of, any interrogation, (10) whether the offered sound recording or writing contains the entirety, or only a portion of the summary, of the communication, (11) the presence or absence of any motive to fabricate, (12) the presence or absence of any express or implicit pressures, inducement or coercion for making the statement, (13) whether the anticipated use of the statement was apparent or made known to the declarant, (14) the inherent believability or lack of believability of the statement, and (15) the presence or absence of corroborating evidence.

[Gross, supra, 121 N.J. at 10.]

Here, the judge examined the fifteen Gross factors in considerable detail and found they supported the reliability and credibility of K.L.'s prior statements. Our review of the record fails to provide us with any reason to disturb the judge's factual findings, analyses of the Gross factors, or conclusion that K.L.'s statements were admissible as substantive evidence.

Next, we reject defendant's contention that the trial court erred in not including the "Multiple Viewings" subsection of Model Jury Charge (Criminal), Identification: Out-of-Court Identification Only (2012) in its instructions to the jury. By its terms, the charge applies "[w]hen a witness views the same person in more than one identification procedure." Here, T.J. viewed the same photo array twice as part of a single identification procedure. Moreover, the parties disputed whether T.J.'s subsequent identification of defendant was because she lied the first time or was pressured by police the second time. In either event, neither party claimed the second identification was tainted by exposure to multiple viewings of defendant's photograph; hence, the charge was inapplicable.

Finally, defendant argues the trial court erred in its response to jury note C-3 because it "focused primarily on physical evidence" and "testimonial evidence was only touched upon as an

afterthought." However, defense counsel encouraged the court to advise the jury it could create an evidence list from the physical items it was already given. The court's response was not only correct but consistent with defense counsel's encouragement. Defendant cannot complain because he invited the error. State v. Munafo, 222 N.J. 480, 487 (2015). Additionally, as part of its response, the court properly reminded the jury that testimony is considered evidence and offered to read back any portion of the testimony the jury requested.

Reversed and remanded for a new trial.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION